# EXHIBIT 1



| Home | Court Explorer | Login |

View Parties

## Case Summary

**Case Number**

2016-150909-CB

**Entitlement**

KELLY SERV INC vs. KIM ANTHONY D

**Judge Name**

JAMES M. ALEXANDER

**Case Filed**

01/06/2016

**Case Disposed**

00/00/0000

**Case E-Filed**

YES

## Register of Actions

| Date | Code | Desc | |
|------|------|------|---|
| 01/14/2016 | AFF | AFFIDAVIT FILED OF PROCESS SERVER | Order Document |
| 01/08/2016 | NOH | NOTICE OF HEARING FILED | Order Document |
| 01/08/2016 | MPR | MOTION PRAECIPE FILED FOR 01272016 JUDGE 02 | |
| 01/07/2016 | OSC | ORDER SHOW CAUSE FILED AND RESTRAIN ORD | Order Document |
| 01/06/2016 | C | COMPLAINT FILED | Order Document |
| 01/06/2016 | NTC | NOTICE FILED ASSIGN BUS CT | Order Document |
| 01/06/2016 | SI | SUMMONS ISSUED | Order Document |
| 01/06/2016 | OTH | CERTIFICATION FILED | Order Document |
| 01/06/2016 | MTN | MOTION FILED PLF/FOR RESTRAIN ORD/INJ/BRF | Order Document |
| 01/06/2016 | POR | PROPOSED ORDER FILED | Order Document |

This case has been designated as an eFiling case. To review a copy of the Notice of Mandatory eFiling visit www.oakgov.com/clerkrod/efiling.

| Approved, SCAO | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| STATE OF MICHIGAN<br>JUDICIAL DISTRICT<br>6th JUDICIAL CIRCUIT<br>COUNTY PROBATE | SUMMONS AND COMPLAINT | CASE NO.<br>JUDGE ALEXANDER<br>16-150909-CB |
|---|---|---|

Court address
1200 N. Telegraph Road, Pontiac, MI

Court telephone no.
(248) 858-0350

| Plaintiff's name(s), address(es), and telephone no(s).<br>Kelly Services, Inc.<br>999 West Big Beaver Road<br>Troy, MI 48084 | v | Defendant's name(s), address(es), and telephone no(s).<br>Anthony D. Kim<br>862 Forest Glen Court<br>Bartlett, IL 60103 |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>McDonald Hopkins PLC<br>James J. Boutrous II (P53710)<br>Maxwell Goss (P78594)<br>39533 Woodward Ave., #318, Bloomfield Hills, MI 48304<br>(248) 646-5070 | | |

**SUMMONS**   **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued<br>JAN 06 2016 | This summons expires<br>APR 06 2016 | Court clerk Lisa Brown |
|---|---|---|

*This summons is invalid unless served on or before its expiration date.
This document must be sealed by the seal of the court.

**COMPLAINT**   *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

**Family Division Cases**
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|

**General Civil Cases**
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|

**VENUE**

| Plaintiff(s) residence (include city, township, or village)<br>Troy, Michigan | Defendant(s) residence (include city, township, or village)<br>Bartlett, Illinois |
|---|---|
| Place where action arose or business conducted<br>Oakland County, Michigan | |

01/06/2016
Date

/s/ James J. Boutrous II
Signature of attorney/plaintiff

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01  (3/08)  **SUMMONS AND COMPLAINT**   MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

| PROOF OF SERVICE | | SUMMONS AND COMPLAINT |
|---|---|---|
| | | Case No. |

**TO PROCESS SERVER:** You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

## CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that: (notarization required) |

☐ I served personally a copy of the summons and complaint,
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,
together with _____
List all documents served with the Summons and Complaint

_____

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

I declare that the statements above are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Mileage fee $ | Total fee $ |
|---|---|---|---|

Signature _____

Name (type or print) _____

Title _____

Subscribed and sworn to before me on _____, _____ County, Michigan.
Date

My commission expires: _____ Signature: _____
Date                                              Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

## ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
Attachments

_____ on _____
Day, date, time

_____ on behalf of _____
Signature

This case has been designated as an eFiling case. To review a copy of the
Notice of Mandatory eFiling visit www.oakgov.com/clerkrod/efiling.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

KELLY SERVICES, INC.,

        Plaintiff,

v                                  Case No. 16 - 150909CB CK

ANTHONY D. KIM,                  Hon. JUDGE ALEXANDER

        Defendant.

McDONALD HOPKINS PLC
By: James J. Boutrous II (P53710)
      Maxwell J. Goss (P78594)
39533 Woodward Ave., Suite 318
Bloomfield Hills, MI 48304
(248) 220-1355
(248) 646-5075 Fax
jboutrous@mcdonaldhopkins.com
mgoss@mcdonaldhopkins.com
**Attorneys for Plaintiff**

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

        There is no other civil action between these parties arising out of
the same transaction or occurrence as alleged in this complaint in
this Court, nor has any such action been previously filed and
dismissed after having been assigned to a judge.

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

    Plaintiff Kelly Services, Inc. ("Kelly"), for its Verified Complaint against Defendant

Anthony D. Kim ("Kim"), states as follows:

    1.     This action arises out of various torts and breaches of contract.

## JURISDICTION AND PARTIES

    2.     Kelly is a Delaware corporation, with its principal place of business in Troy,

Oakland County, Michigan.

{5865600.4}

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

3.      Upon information and belief, Kim is a citizen and resident of Illinois, living at 862 Forest Glen Court, Bartlett, Illinois 60103.

4.      The amount in controversy exceeds $25,000, exclusive of interest, costs, and attorney's fees.

### GENERAL ALLEGATIONS

5.      Kelly is a staffing services company that specializes in providing a wide range of employment staffing and consulting services, including, but not limited to outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, vendor on-site and full-time placement, and consulting services.

6.      Kim was employed with Kelly from July 6, 2004 through his voluntary resignation effective November 19, 2015.

7.      At the time of his resignation, Kim was on a strategic project supporting Kelly's Recruiting Process Outsourcing (RPO) business.  In that position, Kim was most recently responsible, in significant part, for reconstruction of Kelly Outsourcing and Consulting Group's ("KellyOCG") RPO Reconstruction Project, which involved creating a new product for KellyOCG to leverage direct hire suppliers for RPO and Strategic Accounts Organization (SAO) solutions.  Immediately prior to this project, Kim held the position of Global Solutions Design Architect for KellyOCG.  More generally in his role as a Global Solutions Design Architect, Kim was an expert in OCG solutions for external and internal clients, conducting discovery sessions with clients directly to understand their full-time and temporary hiring needs, goals, and pressure points, developing strategies to achieve and overcome same, and ultimately develop the particular recruiting and workforce solution for the client at issue.  Kim's client engagements were local, regional, national and international.  Also, once Kim developed the particular

{5865600:4}                                     2

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

solution for the client at issue, he worked closely with KellyOCG's implementation team to ensure that the delivery of the solution was consistent with what the client was designed by Kim.

8.      Kim's work with KellyOCG necessarily exposed him to highly confidential and proprietary information, which he used on a daily basis in his position.   This information included, but is not limited to, the structure and tools of the Global Solutions Design team, training on all solutions and services within KellyOCG, pricing of OCG and SAO solutions and services, terms of client contracts, exposure to and establishment of key client relationships, client lists, margins for solutions and services, prospect information, sales strategy, internal planning sessions, future innovations for OCG business, tools and technology platforms, such as the Recruiting Process Outsourcing (RPO) Reconstruction Project described above.

9.      Although based in the Greater Chicago area, Kim, as stated, was responsible for the development of client OCG solutions locally, regionally, nationally and internationally. Likewise, in Kim's RPO project role described above, he was developing market based RPO solutions locally, regionally, nationally, and internationally.

10.     Prior to his position as a KellyOCG Global Solutions Design Architect, Kim worked as a Center of Excellence (COE)/Account Manager Lead for KellyOCG programs.

11.     When Kim was hired, he signed an Employment Agreement containing non-compete, non-solicit, and non-disclosure clauses referred to *infra* (**Exhibit A**), accepting those terms as the terms of his employment with the Michigan headquartered Kelly.

12.     At the inception of his employment, Kim executed an Agreement with Full Time Employees of Kelly Corporations ("Agreement") with Kelly.  A true and accurate copy of Kim's Agreement is attached to this Complaint as **Exhibit A** and incorporated herein by reference.

13.     Pursuant to the Agreement, Kim agreed as follows:

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

(1)   . . . I will never disclose, use, copy, or retain any confidential business information or trade secrets belonging to Kelly, Kelly's customers, or Kelly's suppliers.  This includes customer and employee lists; sales, service, recruiting and training techniques and manuals; sales and marketing strategies; computer programs; financial data and other similar information.

(2)   While I am working for Kelly, I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner, stockholder, investor, agent, or consultant. These same limitations apply for one year after I leave Kelly in any market area in which I worked or had responsibility during the past five years of my employment with Kelly.  [**Ex. A, ¶¶ 1, 2.**]

14.    The Agreement also provides that Kim ". . . will pay Kelly's reasonable attorney's fees and costs involved in enforcing this Agreement." (*Id.* at ¶ 6.)

15.    Additionally, the Agreement has a Michigan choice of law provision. (*Id.* at ¶ 7.)

16.    In his role, Kim travelled to Kelly headquarters in Troy, Michigan for training and business meetings.  For example, as recently as February and August 2015, Kim traveled to Kelly's headquarters in Troy, Michigan for training, and then again, in October 2015, Kim returned for further development of the reconstruction project for the RPO and SAO processes.

17.    Additionally, while in Michigan, Kim assisted in the creation and development of the KellyOCG Solution Design Framework (GSD Framework), which is highly proprietary. More specifically, Kim was trained on the GSD Framework, as well as the associated tools attendant to the framework.  The GSD Framework, as stated, is a proprietary approach that provides the GSD team the processes, structure and associated tools that Kelly uses to create solutions for its clients.

18.    Similarly, Kim was trained on the KellyOCG Pricing Models while in Michigan, which provided him specific insight into Kelly's proprietary pricing models, pricing strategies, and pricing goals that are critical in maintaining existing clients and procuring new business.

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

19.     Moreover, one of Kim's principal direct reports, Tim Dupree, Vice President, Group Leader, Global Solution Design, KellyOCG, is based at Kelly's headquarters in Troy, Michigan, with whom Kim conferred with frequently.  Additionally, Kim had regular contact with OCG implementers, many of whom were and are headquartered in Troy, Michigan.

20.     Kelly provided Kim with extensive training and knowledge of KellyOCG's business processes, strategic planning as to the corporate, divisional, and regional business plans, marketing strategies, and recruiting strategies, as more fully described above.

21.     The information to which Kim was exposed is of great value not only to Kelly, but also to its competitors who do not possess, or have access to, this information.  For this reason, Kelly takes reasonable steps to ensure that its information stays confidential.  Such measures include the use of non-compete, non-solicit, and confidentiality agreements, password protection, and access to information on a need-to-know basis.

22.     Kim voluntarily resigned from Kelly on November 19, 2015.

23.     Kim, therefore, agreed to be bound by the terms and obligations set forth in his Agreement with Kelly until November 19, 2016.  (*See* **Ex. A**, ¶ 2.)  However, because Kim has been violating his non-compete obligation since his resignation, the one-year duration does not begin to run until he is in compliance with the terms of the Agreement.

24.     Kelly has recently learned that Kim has accepted a position with Randstad Sourceright USA ("Randstad") – a direct competitor of KellyOCG.  Specifically, Kim, according to his LinkedIn Profile is working as the Vice President, Solution Design for Randstad and began immediately following his resignation from Kelly in direct contravention of his continuing obligations to Kelly.  (*See* Kim LinkedIn Profile, **Exhibit B**.)  Indeed, his position with Randstad is materially the same as his prior position at Kelly.

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

25.     Randstad offers direct hire, executive search, temporary staffing, contract consulting and temp/contract-to-hire solutions across market sectors, career specialties/disciplines and industries.  Randstad is a direct competitor of Kelly and Randstad Sourceright is a direct competitor of KellyOCG.  (*See* About Randstad, **Exhibit C.**)

26.     Upon information and belief, on behalf of Randstad, Kim is working in the same capacity and same market area in which he worked for Kelly.

27.     The confidential information, trade secrets, and customer relationships to which Kim had access will directly aid his employment with a direct competitor, such as Randstad.

28.     Indeed, during his exit interview with Maureen Goodin of Kelly Human Resources, Kim refused to disclose his new employer, and advised that he had consulted with unnamed counsel regarding what information and solutions described above were in fact proprietary to Kelly, and that his view and conclusion was that what he was advised was proprietary would be and was different than Kelly's perspective.  (*See* Goodin Affidavit, **Exhibit D.**)  The implication of this statement of course being that Kim had and has every intention of utilizing KellyOCG's confidential and proprietary information, solutions, processes, etc. in his work for Kelly's direct competitor, Randstad.  Moreover, upon information and belief, Kim downloaded some of this confidential and proprietary data to an external storage device, i.e., thumb drive or the like.  Therefore, Kelly has an immediate concern that its confidential business information may be in Kim's wrongful possession.

29.     Upon information and belief, Kim has wrongfully used, and/or will inevitably use, Kelly's confidential information and trade secrets that she learned during his employment with Kelly.  Further, he is working for a direct competitor of Kelly in knowing violation of his Agreement.  Indeed, Kim's knowledge of this fact is further corroborated by his refusal to

{5865600:4}                                              6

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

disclose the identity of his new employer – now known to be Randstad – at the time of his resignation from Kelly and when he was reminded of his continuing obligations to protect Kelly's legitimate business interests.

30.     As a direct consequence of Kim's actions, Kelly stands to lose its employees, clients and customers, confidential, proprietary and trade secret information, the goodwill and referral business of its clients and customers, and revenues in an amount that cannot be readily ascertained.

31.     Kelly is also faced with the substantial risk that Kim will unlawfully use Kelly's customer, prospect, and employee information and trade secrets to Kelly's competitive disadvantage.   As a result of Kim's actions, Kelly has suffered and will continue to suffer irreparable harm.

32.     If Kim is not immediately barred from violating his Agreement and from using Kelly's confidential and proprietary information to solicit customers and employees of Kelly, and from otherwise participating in activities that violate the non-competition provision of the Agreement, Kelly will continue to suffer irreparable harm.

33.     Kelly lacks an adequate remedy at law to address the substantial and irreparable harm it is suffering as the result of Kim's actions.

**COUNT I**
**BREACH OF CONTRACT**
**NON-COMPETITION PROVISION**

34.     Paragraphs 1 through 33 are realleged and incorporated by reference as if fully set forth herein.

35.     The Agreement executed by Kim is a valid and binding contract.

36.     The Agreement executed by Kim was supported by adequate consideration.

37.     Kim's employment with Randstad – in the same capacity and same market area in which he worked while at Kelly – constitutes a breach of the non-competition provision contained in Paragraph 2 of the Agreement, attached as **Exhibit A**.

38.     As a result of Kim's conduct, Kelly has suffered irreparable injury, and there is immediate and imminent danger that Kelly will continue to suffer irreparable injury for which there is no adequate remedy at law.

39.     Kelly is entitled to preliminary and permanent injunctive relief against further breaches of the Agreement.   Kelly further has suffered damages as a direct result of these breaches which include, but are not limited to, lost profits and attorneys' fees.

## COUNT II
## BREACH OF CONTRACT
## CONFIDENTIALITY/NON-DISCLOSURE PROVISION

40.     Paragraphs 1 through 39 of this Complaint are realleged and incorporated herein by reference as if fully set forth herein.

41.     The Agreement executed by Kim is a valid and binding contract.

42.     The Agreement executed by Kim was supported by adequate consideration.

43.     Kim's use and disclosure of Kelly's confidential and proprietary information constitutes a breach of the confidentiality/non-disclosure provision contained in Paragraph 1 of the Agreement, attached as **Exhibit A**.

44.     As a result of Kim's conduct, Kelly has suffered irreparable injury, and there is immediate and imminent danger that Kelly will continue to suffer irreparable injury for which there is no adequate remedy at law.

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

45.    Kelly is entitled to preliminary and permanent injunctive relief against further breaches of the Agreement.  Kelly further has suffered damages as a direct result of these breaches which include, but are not limited to, lost profits and attorneys' fees.

**COUNT III**
**BREACH OF DUTY OF LOYALTY**

46.    Paragraphs 1 through 45 of this Complaint are realleged and incorporated herein by reference as if fully set forth herein.

47.    Kim has duties of loyalty to Kelly.

48.    Kim assumed a position of trust and confidence during his employment with Kelly.  He was placed in a position of trust and confidence with regard to Kelly's confidential information and trade secrets in his possession and his duties of loyalty not to use or disclose this information during or upon termination of his employment.

49.    Kim has breached his duties of loyalty by disclosing or using the confidential information and trade secrets of Kelly in competition with Kelly and on behalf of Randstad.

50.    Kim will, unless restrained, continue to violate Kelly's rights and continue to ignore her duties not to disclose or use proprietary information and trade secrets of Kelly.

51.    As a proximate cause of Kim's breaches of his duties of loyalty, Kelly has sustained irreparable harm.  As such, Kelly is entitled to a permanent injunction enjoining Walton from breaching her fiduciary duties.

**REQUEST FOR RELIEF**

**WHEREFORE**, Kelly requests:

(1)    That this Court issue a Temporary Restraining Order and Preliminary and Permanent Injunction restraining and enjoining Defendant Anthony D. Kim, directly or indirectly:

(a)    From working for, or acting as, an employee, partner, stockholder, investor, owner, director, agent, or consultant for a competitor of Kelly, including, but not

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

limited to, Randstad, until one (1) year from the date of entry of this Court's order;

(b)    From soliciting or performing services for any Kelly customer or client for a competing business, including, but not limited to, Randstad, until one (1) year from the date of entry of this Court's order;

(c)    From soliciting or being involved in the recruitment or hire of any Kelly employee for a competing business, including, but not limited to, Randstad, until one (1) year from the date of entry of this Court's order; and

(d)    From using or disclosing any of Kelly's confidential, proprietary or trade secret information or property.

(2)    That Kim be ordered in the form of a mandatory preliminary injunction to immediately return all Kelly property to Kelly, including all originals and copies of tangible property, proprietary documents, trade secrets, confidential information, discs, notes, client files, client information, employment information, business development information, request for proposal, request for bid, client correspondence, meeting minutes, notes of site visits, marketing data, prospect meeting data, proposals, faxes, financial information, pricing, contracts, marketing brochures, marketing database, marketing plans, costs, customer lists, customer information, internal weaknesses, prospect lists, client lists, employee lists, alliance relationships, competitive bid information, client contact lists, sales leads, prospective employee lists, business plans, profit, margin, and forecasting information, strategic planning, project costs, vendor information and contracts, and any other Kelly data whether kept in hard copy or electronic form;

(4)    That after trial in this action, a permanent injunction be issued to the same effect as the preliminary injunction requested above; and

(5)    That Kelly be granted as relief money damages, including exemplary damages, lost profits, all other appropriate damages, as well as all interest, costs, and disbursements of this action, including actual attorneys' fees and costs as provided for by Kim's Agreement and under applicable statute, and such other relief as this Court may deem just and proper.

{5865600:4}

Respectfully submitted,

McDONALD HOPKINS PLC

/s/James J. Boutrous II
James J. Boutrous II (P53710)
Maxwell J. Goss (P78594)
39533 Woodward Ave., Suite 318
Bloomfield Hills, MI 48304
(248) 220-1354
(248) 646-5075 Fax
jboutrous@mcdonaldhopkins.com
mgoss@mcdonaldhopkins.com
**Attorneys for Plaintiff**

Dated:  January 6, 2016

{5865600:4}

11

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

KELLY SERVICES, INC.,

        Plaintiff,

                                          Case No. 16 - _____ - CK

v

                                          Hon. _____

ANTHONY D. KIM,

        Defendant.

McDONALD HOPKINS PLC
By:  James J. Boutrous II (P53710)
      Maxwell J. Goss (P78594)
39533 Woodward Ave., Suite 318
Bloomfield Hills, MI 48304
(248) 220-1355
(248) 646-5075 Fax
jboutrous@mcdonaldhopkins.com
mgoss@mcdonaldhopkins.com
**Attorneys for Plaintiff**

## **VERIFICATION**

    Tim L. Dupree, being duly sworn, deposes and states that he is Vice President, Group

Leader, Global Solution Design, Kelly Outsourcing & Consulting Group, for Kelly Services,

Inc., Plaintiff in the above-entitled action; that he has read the foregoing Verified Complaint for

Injunctive and Other Relief and knows the contents thereof; and that the statements of fact

contained therein are true to the best of his knowledge, information, and belief.

{5875210;}                              1

TIM L. DUPREE

Subscribed and sworn to before
me this 5ᵗʰ day of January, 2016

Notary Public

My Commission Expires: 4-16-16

CATHERINE JO SAGE
Notary Public - Michigan
Oakland County
My Commission Expires Apr 16, 2016
Acting in the County of _____

{5875210:}

2

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

# Exhibit A



Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

# AGREEMENT WITH
# FULL-TIME EMPLOYEES
# OF KELLY® CORPORATIONS

## Statement of Purpose

In order to provide the highest quality service to its customers and maintain its leadership position in the temporary help industry, Kelly Services spends substantial time, effort, and money in recruiting and training its employees, and developing programs and services to meet its customers' needs. All Kelly employees have an obligation to help protect this investment.

\*          \*          \*          \*

In consideration of my employment with Kelly Services, Inc., Kelly Assisted Living Services, Inc., or any other Kelly corporation ("Kelly"), I agree as follows:

(1)    Unless required by my job at Kelly, I will never disclose, use, copy, or retain any confidential business information or trade secrets belonging to Kelly, Kelly's customers, or Kelly's suppliers. This includes customer and employee lists; sales, service, recruiting and training techniques and manuals; sales and marketing strategies; computer programs; financial data and other similar information.

(2)    While I am working for Kelly, I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner, stockholder\*, investor\*, agent, or consultant. These same limitations apply for one year after I leave Kelly in any market area in which I worked or had responsibility during the past five years of my employment with Kelly.

(3)    Kelly may use and publish my name and picture, including audio or video tape recordings, for purposes relating to its business without a specific release from me.

(4)    Any new idea, invention, improvement, or copyrightable work I create, develop, or help develop belongs to Kelly if it relates to Kelly's business. If any such development or creation occurs during my employment or up to one year after I leave Kelly, I will promptly disclose and explain it and assign to Kelly all rights I may have in it without additional compensation.

(5)    Either of us may end the employment relationship at any time with or without cause, subject to applicable laws concerning non-discrimination with regard to age, race, sex, and the like. However, Kelly shall give me a minimum of two weeks' notice (or two weeks' wages in lieu of notice) unless there is reason for immediate termination, such as dishonesty, serious misconduct, or a significant violation of corporate policy.

\*Except up to 2% of the stock of a publicly traded company.

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

(6)   If I break this Agreement, Kelly is entitled to recover as damages from me the greater of the amount of the financial loss which Kelly suffers as a result or the amount of the financial gain which I receive. I will pay Kelly's reasonable attorney's fees and costs involved in enforcing this Agreement.

(7)   This Agreement will be interpreted and enforced under Michigan law. If a court finds any part of this Agreement invalid, the rest of it will be enforced to the extent permitted.

(8)   I will make any claim and bring any action or lawsuit I may have relating to my employment with Kelly within one year after leaving my employment. I agree to waive any statute of limitation to the contrary.

(9)   This Agreement takes the place of all previous employment agreements. Any changes must be in writing, and must be signed by me and by two senior corporate officers of Kelly.

(10)  My signature below indicates that I have read, understood, and agreed to the provisions of this Agreement.

KELLY SERVICES, INC.
KELLY ASSISTED LIVING SERVICES, INC.

*T. E. Adderley*

T.E. Adderley

_Anthony D Kim_
Employee Signature

ANTHONY D KIM
Employee Name (typed/printed)

Social Security Number

Kraft - KVMS          2482
Branch/Dept. Name          Branch/Dept. Number

Date:   07/06/04

JUL : . .

*INSTRUCTIONS*
*Ask the employee to sign three forms:*
- *Send one to Corporate Employee Records.*
- *Give one to the employee for his/her records.*
- *Retain one in the branch.*

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

# Exhibit B

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Anthony Kim | LinkedIn

Page 1 of 4

≡  ⌄   Search for people, jobs, companies, and more.    🔍   Advanced      👤

71 New Michigan Clients • 71 new legal clients seeking a Michigan attorney. View their cases today  | Read More »



### Anthony Kim
Vice President, Solution Design - Randstad Sourceright

Greater Chicago Area , Human Resources

| | |
|---|---|
| Current | Randsted Sourceright |
| Previous | KellyOCG, Make Corporation Inc, Alpine Consulting |
| Education | Roosevelt University |

**Send Anthony InMail**

https://www.linkedin.com/in/anthony-kim-72aa5a4

**500+**
connections

Background

 **Summary**

Fifteen years of Managed Service Provider (MSP) & Contingent Labor industry experience. I have designed global contingent labor solutions for many Fortune 100 customers. My expertise includes all contingent labor categories, including staff augmentation, independent contractors, freelancers, retirees, project-based workers and consultants.

 **Experience**

**Vice President, Solution Design**
Randstad Sourceright
November 2015 – Present (2 months) | Greater Chicago Area

**Global Solutions Design Architect - Kelly Outsourcing Consulting Group**
KellyOCG
July 2004 – November 2015 (11 years 5 months) | Greater Chicago Area

**Technical Recruiter**
Make Corporation Inc
2004 – 2004 (less than a year)

**Technical Recruiter**
Alpine Consulting
2000 – 2004 (4 years)

 **Skills**

Top Skills

This pag

- Make sure the web a
- Look for the page wit
- Refresh the page in a

**People Also Viewed**

 **Jill Koclan**
Director, Solutions Architecture and Enhanced Services at KellyOCG

 **Maria Rosploch**
Vice President, Global Solutions Architecture and Enhanced Services at KellyOCG

 **Deb Valentine**
Workforce Solutions Consultant

 **Annie Boettcher**
National Accounts, Enterprise Solutions

 **Corinna Garza**
Director, Strategic Accounts: Randstad Professionals

 **Thomas F. Kaminsky**
Vice President - Practice Lead, Global Consulting Group at KellyOCG

 **Teri Sena**

4

Anthony Kim | LinkedIn

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30



66 Mike joined my team a few years ago and has been a vital asset to Kelly and our customer. Very early on in his role with the team Mike took the initiative to step in as the primary liaison of a technology partner that allowed the team to centralize many of their issues which resulted in quicker resolution to issues.

Mike picked up the new processes and procedures very... more

March 22, 2010, Anthony managed Michael at KellyOCG



Eric Treida
Managing Director - Chicago

66 Eric and his team was a preferred supplier to a vendor management office I supported in 2004-2007. Eric was a pleasure to work with and did a great job matching our open positions with qualified resources. He also understands the vendor management industry and worked with the program/policies. Eric was a pleasure to work with!

March 16, 2010, Anthony was Eric's client



Derek Timson
Program Management at SunMicrosystems; Oracle

66 Derek has been on my team since April 2007. In this time, he has grown in his role as a Vendor Management Specialist. He works very well with his peers and others within the organization.

The end users Derek support consistently praise him on his high customer service skills.

February 11, 2010, Anthony managed Derek at KellyOCG

Groups



VMS and MSP
2,681 members
Join



Vendor Management...
2,073 members
Join

CONTINGENT
WORKFORCE
STRATEGIES

Contingent Workforc...
5,100 members
Join

Following

**News**



Pulse
117,549 followers
Following



People also viewed          x
Jill Koolan Director, Solutions
Architecture and Enhance

Anthony Kim | LinkedIn

**Companies**

≡ ·   Search for people, jobs, companies, and more    🔍   Advanced          



ManpowerGroup
Staffing and Recruiting
Follow



LinkedIn
Internet
Follow

ORACLE

Oracle
Information Technology
and Services
Follow



Randstad Sourceright
Human Resources
Follow



Adecco Group
Staffing and Recruiting
Follow

ALLEGIS

Allegis Group
Staffing and Recruiting
Follow

KELLY

KellyOCG
Management Consulting
Follow

See 4 more

**Schools**

PURDUE

Purdue University
West Lafayette, Indiana
Follow



Roosevelt University
Greater Chicago Area
Follow

Help Center   About   Careers   Advertising   Talent Solutions   Sales Solutions   Small Business   Mobile   Language   Upgrade Your Account

LinkedIn Corporation © 2015   User Agreement   Privacy Policy   Ad Choices   Community Guidelines   Cookie Policy   Copyright Policy   Send Feedback

 People also viewed        ✕
Jill Koslan Director, Solutions
Architecture and Enhance .        ›

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

# Exhibit C

Randstad Sourceright: Overview | LinkedIn                                    Page 1 of 4

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

≡ · Search for people, jobs, companies and more...    🔍 Advanced

    



**Randstad Sourceright**
Human Resources
1001-5000 employees

14,815 followers    Follow

Home

Now you can share this page with your connections across social networks.



discover the human Intelligence advantage

It has the power to transform your organization through the recognized value of people and their contribution to business success.

ɣ randstad sourceright

**How You're Connected**

  

3+

**10** second-degree connections
**1,389** Employees on LinkedIn

See all ›

The combination of Human + Intelligence elevates the conversation and potential. It's the capability to drive decisions about meeting short-term operational needs and advancing longer-term strategic plans. It's the motivation to drive progress, to never stand still. This is what we call the Human Intelligence Advantage.

See more

**Careers**



Interested in Randstad Sourceright?
15 jobs posted

See jobs ›

**Recent Updates**

Randstad Sourceright Our Senior Director of RPO, Jim Stroud, makes YouTern's list of Top 50 Twitter Accounts for Young Careerists to follow! http://buff.ly/1Z19cle



**YouTern's Top 50 Twitter Accounts Young Careerists MUST Follow 2015**

buff.ly    With all the noise and clutter in social media today, how do you know where to go for really good career advice? Who will help - really help - you find your first, or next, internship or job?

Like (5)    Comment    Share    21 hours ago

Carmelina Agbayani, Tina M. Boyd +3

Add a comment...

# This pag

- Make sure the web a
- Look for the page wi
- ~~Refresh the page in a~~

Randstad Sourceright Recruiting Blogs gave us a review of recruiting trends for 2015 --> http://bit.ly/1QiHr1f



**What happened in 2015: job boards, recruiting sites, and....money**

bit.ly    Another year has (almost) come and gone. Startups have started up, sites have been sold, money has gone into the market (and out of the market), in other words, a pretty good year for folks in our industry

Like (8)    Comment    Share    1 day ago

Tine Plasqui, Edyta R +6

Add a comment...

**People Also Viewed**

    

    

Randstad Sourceright U.S. adds 211K jobs in November, while the unemployment rate remains at 5%. http://randstad.us/1tJOOkq



**Randstad Jobs Report: November 2015**

randstad.us    According to the Bureau of Labor Statistics' (BLS) most recent Employment Situation Summary, the U.S. economy added more jobs in November than originally anticipated (+211,000) while the unemployment rate held steady at 5 percent.

Randstad Sourceright: Overview | LinkedIn                                    Page 2 of 4

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Job gains for September and October were upwardly revised by 8,000 and 27,000, respectively, a total net gain of 35,000 jobs.

Like (16)    Comment    Share    2 days ago

Agnieszka Kolanowska, Carlota Borges +14

Add a comment...

Randstad Sourceright The 2016 HR checklist, 10 things you need to make talent acquisition a breeze in 2016 http://hubs.ly/H01yd5l0



the 2016
HR checklist
10 questions to ask
if your talent strategy
is ready for growth

Like (30)    Comment    Share    8 days ago

Caroline Hallgren, Olga Żółkiewicz +28

Add a comment...

Randstad Sourceright In case you missed our MSP webinar on building a multi-country workforce strategy for Asia Pacific, you can view it here: http://goo.gl/5Zua2c



**Building a multi-country contingent workforce strategy for Asia Pacific**

goo.gl    It is no secret that managing a flexible workforce comes with great challenges. From cost management and skills shortages, to legal risk and physical security, mismanaging this critical source of talent can cause real problems for even the most...

Like (6)    Comment    Share    14 days ago

Jessica Bailey, Steve Tolen +4

Add a comment...

Randstad Sourceright Join our MSP thought leaders tomorrow. Register for free at http://bit.ly/1PDvJ4tc



Like (21)    Comment (1)    Share    17 days ago

Firdaus Zuber, Asinh McCalip-Gradford +19

Subalatha Bala Subramaniam Kumar N
17 days ago

Add a comment...

Ads You May Be Interested In

 **62 New Michigan Clients**
62 new legal clients seeking a
Michigan attorney. View their cases
today

 **15 Hiring Process Tips!**
Improve Your Online Hiring
Process with These Top Tips. View
Article!

 **The Top Trial Lawyers**
Million Dollar Advocates Forum
Since 1983. Are you qualified?

Featured Groups

 **Randstad Sourceright...**
1,728 members
Join

Randstad Sourceright: Overview | LinkedIn

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Randstad Sourceright Don't forget to register for our MSP webinar "Building a Multi-Country Contingent Workforce Strategy for Asia Pacific." This will be held on Wednesday, Dec 2nd at 3:30 PM SGT. Sign up for free at http://bit.ly/1PDvJ4c

Advanced







**Building a multi-country contingent workforce strategy for Asia Pacific**

Like (13)    Comment    Share    18 days ago

Josh Peek, Edward (C R.) Boyes +11

Add a comment..

---

Randstad Sourceright There is an element many organizations miss when considering the project hiring landscape: "project EVP." Read Richard Cogswell's new blog on how an MSP solution can put your project EVP to work to win and retain critical project talent https://lnkd.. more



**when retaining project talent and IP is critical, MSPs offer solutions**

Insights.randstadsourceright.com    In the first part of this blog series, I explained how organizations that generate revenue from project work can win more deals by demonstrating effective talent management. In the second part, let's examine how an MSP can help you better win and ..

Like (6)    Comment    Share    21 days ago

Tina M. Boyd, Feman Serao +4

Add a comment...

---

Randstad Sourceright Our Sydney team is hosting two roundtable sessions on 10th December. If you want to learn more about next generation MSP solutions and HR's top priorities in 2016, please join us and send your registration to steve.tolen@randstadsourceright.com.au





HR roundtable sessions

Like (8)    Comment    Share    22 days ago

Carlton Newton, Jessica Tyre +6

Add a comment...

---

Randstad Sourceright Today's talent sourcing experts are a new breed of recruiting specialists that bring a diversity of skills and expertise to this specialist role. Discover their unique DNA... https://lnkd.in/e2ZBmKV

**the DNA of a great-performing sourcer**
Insights.randstadsourceright.com



Randstad Sourceright: Overview | LinkedIn

Page 4 of 4

What are the traits of a successful sourcing professional? Is it education, experience, personal skill? In building Randstad Sourceright's sourcing center of excellence in Budapest, Balazs Paroczay, Head of Recruiting Strategy and Innovation,...

Advanced

Like (13)   Comment   Share   28 days ago

Beth Story, Franciska Horváth +11

Add a comment...

Show More Updates

Help Center   About   Careers   Advertising   Talent Solutions   Sales Solutions   Small Business   Mobile   Language   Upgrade Your Account

LinkedIn Corporation © 2015   User Agreement   Privacy Policy   Ad Choices   Community Guidelines   Cookie Policy   Copyright Policy   Send Feedback

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Consulting and Projects | Consulting and Solutions

Page 1 of 2

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

■ home / staffing and solutions / consulting and projects

# experts in consulting and project management

Our consulting teams fully understand what it takes to build a cohesive team that can get your company to market efficiently and cost effectively. With our consulting and project management teams, our focus is on you, the client, and doing everything in our power to make your projects successful and driving business results.

contact to learn more





## expert talent waiting for you

At Randstad, our consulting teams fully understand what it takes to build a cohesive team that can get your company to market efficiently and cost effectively. We provide the pre-qualified talent your organization needs to succeed when it needs it most.



### executive search



Our executive search teams are lead by Randstad's Tatum business, the largest executive services firm in the United States. Whether your executive search is for an interim or permanent position, our teams deliver seasoned professionals that meet your business goals.

learn more > (/staffing-and-solutions/consulting-and-projects/executive-solutions/)

### healthcare solutions

Randstad's healthcare solutions team is an industry leader. We not only work for our clients, but we work with them by offering comprehensive healthcare solutions that create synergy between departments across healthcare organizations.

learn more > (/staffing-and-solutions/consulting-and-projects/healthcare-solutions/)

### IT solutions

Consulting and Projects | Consulting and Solutions                    Page 2 of 2



We are subject matter experts finding the right IT solutions to meet your business needs. Our IT consulting team advises clients on how to use technology, data, and processes to meet business needs.
learn more > (/staffing-and-solutions/consulting-and-projects/it-solutions/)

### pharma consulting



Randstad's pharma consulting and project management services teams have developed relationships with the best talent in the industry. We can find qualified consultants very quickly to help bring your project concepts to fruition.
learn more > (/staffing-and-solutions/consulting-and-projects/pharmaceutical-consulting/)

return to staffing and solutions

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

# Exhibit D

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

STATE OF MICHIGAN )
                             ) ss
COUNTY OF OAKLAND )

## AFFIDAVIT OF MAUREEN GOODIN

I, Maureen Goodin, being first duly sworn according to law, depose and state as follows:

1.     This Affidavit and the facts contained herein are based on my personal knowledge, and, if called to testify, I could testify competently as to the facts stated in this Affidavit.

2.     I am employed as Vice President - Global Human Resources for Kelly Services, Inc. ('Kelly'), and was so at the time Anthony D. Kim voluntarily resigned his employment on or about November 19, 2015.

3.     At the time of Mr. Kim's departure, I conducted his exit interview and in conjunction with the interview reminded Mr. Kim of his continuing restrictive covenant obligations to Kelly.  In follow-up to the interview, I also provided him a copy of his Kelly Agreement.

4.     During the exit interview, Mr. Kim indicated that he had already consulted with an attorney, whose name Mr. Kim did not disclose, and was advised that much of what Kelly considered to be "proprietary" or "confidential" information was in fact not.  I asked Mr. Kim who his new employer was and Mr. Kim refused to disclose same.

5.     The foregoing is based upon personal knowledge, and if called as a witness, I am competent to testify to the matters contained herein.

                                                     Maureen Goodin

Subscribed and sworn to before me
this 4th day of January, 2016

Notary Public

CATHERINE JO SAGE
Notary Public - Michigan
Oakland County
My Commission Expires Apr 16, 2016
Acting in the County of _____

{5879910:}

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

# Exhibit E

LEXSEE 495 F SUPP 2D 645

KELLY SERVICES, INC., Plaintiff, v. NED NORETTO, Defendant.

CIVIL CASE NO. 07-12389

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION

*495 F. Supp. 2d 645; 2007 U.S. Dist. LEXIS 49547*

July 9, 2007, Decided
July 9, 2007, Filed

COUNSEL: [**1] For Kelly Services, Incorporated, Plaintiff: James J. Giszczak, LEAD ATTORNEY, Butzel Long (Detroit), Detroit, MI, Katherine D. Goudie, Butzel Long (Detroit), Detroit, MI.

For Ned Noretto, Defendant: Kirk M. Liebengood, Kirk M. Liebengood (Flint), Flint, MI.

JUDGES: HONORABLE PAUL V. GADOLA, UNITED STATES DISTRICT JUDGE.

OPINION BY: PAUL V. GADOLA

OPINION

[*648] ORDER

Now before the Court are Plaintiff Kelly Services, Inc.'s ("Kelly") motion for a preliminary injunction pursuant to *Federal Rule of Civil Procedure 65(a)*; Defendant Ned Noretto's ("Noretto") motion to dismiss for lack of personal jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(2)*; and Defendant Noretto's motion to dismiss or transfer for improper venue, pursuant to *28 U.S.C. §§ 1391, 1406.* [1]

> 1   The Court notes that Defendant has not made an argument that, pursuant to *28 U.S.C. § 1404*, venue should be transferred to the District of Oregon for the convenience of the parties and the witnesses.

For the reasons stated below, the Court will grant Plaintiff's request for a preliminary injunction and deny Defendant's motions to dismiss or transfer venue.

I. Factual Background

Plaintiff Kelly Services, Inc., is a Delaware corporation with its principal place [**2] of business in Troy, Michigan. Defendant Ned Noretto is a citizen and resident of Oregon. Noretto has been engaged in the "staffing industry" for twenty-one years and was employed by Kelly from January 28, 2002 through May 4, 2007. Noretto was employed by Kelly as a Regional Manager for the Major Markets Division, working out of the Portland, Oregon branch office. Noretto's geographic area of responsibility included Multnomah, Clackamas, Washington, Columbia, Clatsop, Marion, Yamhill, Linn, Tillamoook, Lincoln and Wasco counties in the State of Oregon, as well as Clark, Skamania, and Cowlitz counties, in the State of Washington.

At the time Defendant Noretto began employment with Kelly in 2002, Noretto executed a document entitled "Agreement with Full Time Employees of Kelly Corporations" ("Agreement"). The Agreement provides, in pertinent part:

> In consideration of my employment with Kelly Services, Inc., Kelly Assisted Living Services, Inc., or any other Kelly corporation ("Kelly"), I agree as follows:
>
> (1) Unless required by my job at Kelly, I will never disclose, use, copy or retain any confidential business information or trade secrets belonging to

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

495 F. Supp. 2d 645, *649; 2007 U.S. Dist. LEXIS 49547, **2

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

[*649] Kelly, Kelly's customers or Kelly's [**3] suppliers. This includes customer and employee lists; sales, service, recruiting and training techniques and manuals; sales and marketing strategies; computer programs; financial data and other similar information.

(2) While I am working for Kelly, I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner, stockholder, investor, agent or consultant. These same limitations apply for one year after I leave Kelly in any market area in which I worked or had responsibility during the last five years of my employment with Kelly.

Pl.'s Verified Compl., p. 15

On April 2, 2007, after five years of employment with Kelly, Defendant submitted his verbal resignation to his supervisor, located in Troy, Michigan. Although Defendant maintains that he resigned only because he was about to be fired-a contention Defendant denies-Noretto does not dispute that his resignation was voluntary. The resignation was to be effective May 4, 2007.

The parties dispute the exact manner in which Defendant departed his employment with Kelly. Plaintiff alleges that when Noretto's supervisor [**4] questioned Noretto about his future plans for employment following resignation, Noretto indicated that he had no other plans for employment at that time, that he simply couldn't do that type of work anymore, and that he was taking an extended vacation with his family. Plaintiff further alleges that Defendant was reminded of the pertinent non-compete, non-solicit, and non-disclosure clauses in the Agreement. Defendant disputes that he ever participated in an exit interview upon his resignation from Kelly or that the clauses were specifically brought to his attention.

Shortly after Defendant resigned his employment from Kelly on May 4, 2007, Defendant allegedly began working for Volt Information Service, Inc. ("Volt"), a

direct competitor of Kelly in the staffing industry. Kelly became aware of Defendant's employment with Volt when an email was exchanged between employees of the local offices of Volt and Kelly. In the email between the companies regarding a mutual client that Noretto had allegedly serviced while with Kelly, Noretto was included as a recipient in his capacity as a Volt employee. Therefore, Plaintiff became aware that Noretto had taken up employment with its direct competitor [**5] Volt, and that Noretto was possibly soliciting his former clients.

Kelly alleges that, as part of his employment and specific position with Kelly, Noretto had access to, and utilized on a regular basis, Kelly's confidential and proprietary information including information concerning Kelly's business affairs, customer lists, operational procedures, marketing and sales strategies and practices, contractual details for customers, regional customer pricing and profit margins, recruiting plans, and recruiting sources. Additionally, Kelly claims that Noretto acquired intimate knowledge concerning Kelly's customers' preferences and service needs, and had extensive contact with two of Kelly's largest and most critical accounts. Plaintiff also alleges that just two weeks before Defendant's separation, Defendant received a "flash drive" containing work proposals for Kelly's customers and prospective customers and other confidential information and trade secrets of Kelly. Plaintiff contends that, despite requests to do so, Defendant has failed to return the flash drive containing the information. Plaintiff asserts that the information to [*650] which Noretto was exposed in his position with Kelly is [**6] of great value, not only to Kelly, but also to its competitors who do not possess, or have access to, this information.

Kelly now claims that as a result of the aforementioned factual developments, Noretto is in violation of the terms of the Agreement he signed upon employment with Kelly and that he is in violation of the Michigan Uniform Trade Secrets Act ("MUTSA"), M.C.L. § 445.1901, et seq. Kelly alleges that it faces a substantial risk that Noretto will unlawfully use Kelly's client and customer information and trade secrets to Kelly's competitive disadvantage. Kelly argues that it stands to lose employees, clients, and customers; lose confidential, proprietary and trade secret information; lose goodwill and referral business of its clients and customers; and suffer a decrease in revenues in an

495 F. Supp. 2d 645, *650; 2007 U.S. Dist. LEXIS 49547, **6

Received for Filing Oakland County Clerk 2016 JAN 06 03:30

amount that cannot readily be ascertained.

## II. Procedural Background

On June 6, 2007, following Plaintiff's motion for a temporary restraining order, the Court conducted an ex-parte hearing and issued the order. *Order Granting Temporary Restraining Order* [docket entry # 5]. The Court also scheduled a hearing for June 14, 2007 on Plaintiff's motion for a preliminary injunction. At the June 14, [**7] 2007 preliminary injunction hearing, each side made brief remarks and then stipulated to an extension of the TRO until July 9, 2007. The Court ordered further briefing of the parties' positions and set a hearing for the pending matters on July 9, 2007.

Plaintiff now seeks a preliminary injunction, restraining and enjoining Defendant Noretto, directly or indirectly:

> (a) from working for, or acting as, and employee, partner, stockholder, investor, owner, director, agent, or consultant for a competitor of Kelly (including, but not limited to, Volt) within Multnomah, Clackamas, Washington, Columbia, Clatsop, Marion, Yamhill, Linn, Tillamook, Lincoln and Wasco Counties, in the State of Oregon and Clark, Skamania, and Cowlitz Counties it the State of Washington, until May 4, 2008

> (b) from soliciting or performing services for any Kelly customer for a competing business until May 4, 2008

> (c) from soliciting or being involved in the recruitment or hire of any Kelly employee for a competing business (including but not limited to Volt) until May 4, 2008

> (d) from ever using or disclosing any of Kelly's confidential, proprietary or trade secret information or property;

> (e) from interfering, in any way, [**8] with any current or prospective customer or employee relationship of Kelly; and

> (f) from breaching any fiduciary obligation and duties of loyalty to Kelly, including but not limited to, appropriating any business opportunity of Kelly, engaging in deceptive acts or statement with regard to Kelly's ability, experience and personnel, otherwise attempting to gain unfair advantage in the employee leasing and staffing business, or disclosing or using Kelly's confidential or proprietary information.

Pl.'s Verified Compl., p. 10.

Kelly also requests that the Court require Noretto to return all Kelly property to Kelly, including all originals and copies of tangible property, proprietary documents, trade secrets, confidential information, discs, notes, client files, client information, employment information, business development information, request for proposal, request for bid, client correspondence, meeting minutes, notes of site visits, marketing data, prospect meeting data, proposals, faxes, financial information, pricing contracts, marketing brochures, [*651] marketing database, marketing plans, costs, customer lists, customer information, internal weaknesses, prospect lists, client lists, employee [**9] lists, alliance relationships, competitive bid information, client contact lists, sales leads, prospective employee lists, business plans, profit margin, and forecasting information, strategic planning, project costs, and any other Kelly data kept in any form or media whatsoever. *Id.*

Defendant has now filed two motions of his own. First, Defendant asserts that because he lives and works in Oregon, because his only actions in Michigan consisted of attending mandatory training for Kelly in Michigan, and because his actions have had no consequences in Michigan, the Court lacks personal jurisdiction over him. Second, Defendant maintains that because there is no property at issue in this matter and because the events and conduct at issue all occurred in and around Portland, Oregon, venue is proper in Oregon. Therefore, Defendant asks this Court to direct that this case be dismissed or transferred to the District of Oregon.

The Court will first address the issue of personal jurisdiction.

## III. Personal Jurisdiction

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

495 F. Supp. 2d 645, *651; 2007 U.S. Dist. LEXIS 49547, **9

Defendant Noretto moves to dismiss the case for lack of personal jurisdiction, pursuant to *Federal Rules of Civil Procedure 12(b)(2)*. Defendant maintains that personal jurisdiction [**10] is inappropriate in Michigan. Defendant argues that he is a resident of Oregon and has only come to Michigan on several sporadic occasions when required to do so as part of his employment with Kelly. Furthermore, Noretto argues that there was no act done or consequences that occurred in the State of Michigan as part of the basis for this action.

## A. Legal Standard

Plaintiff bears the burden of establishing personal jurisdiction. *Bird v. Parsons, 289 F.3d 865, 871 (6th Cir. 2002); MCNIC Oil & Gas Co. v. IBEX Resources Co., 23 F. Supp. 2d 729, 732 (E.D. Mich. 1998)* (Gadola, J.). The standard for evaluating whether personal jurisdiction exists depends upon whether the Court conducts an evidentiary hearing on the issue. In this case, because the Court has not conducted an evidentiary hearing on this issue, Plaintiff "need only make a prima facie showing of jurisdiction." *Bird, 289 F.3d at 871* (citation and internal quotation omitted). Under this standard, the United States Court of Appeals for the Sixth Circuit has stated that the pleadings and affidavits should be considered in the light most favorable to Plaintiff and has characterized Plaintiff's burden of establishing jurisdiction as "relatively [**11] slight." *Welsh v. Gibbs, 631 F.2d 436, 438-39 (6th Cir. 1980)*.

In diversity cases such as the instant one, courts look to the law of the forum state to determine whether personal jurisdiction exists. *Nationwide Mutual Ins. Co. v. Tryg Int'l. Ins. Co., Ltd., 91 F.3d 790, 793 (6th Cir. 1996)*. The nature of Defendant's contacts with the forum determine whether personal jurisdiction is characterized as general or specific. *Cont'l v. Pneumatic Prods. Corp., 977 F.2d 978, 981 (6th Cir. 1992)*. General jurisdiction exists when a defendant exercises continuous and systematic contacts with the forum state, while specific jurisdiction exists when a plaintiff's claims arise out of or relate to a defendant's conduct with the forum state. *See id.; Kerry Steel, Inc. v. Paragon Indus., 106 F.3d 147, 149 (6th Cir. 1998)*.

To establish personal jurisdiction, Plaintiff "must show that (1) the Michigan long-arm statute supports the Court's exercise of personal jurisdiction and (2) the [*652] exercise of jurisdiction would not violate the *Due Process Clause of the Fourteenth Amendment*." *Viches v.*

*MLT, Inc., 127 F. Supp. 2d 828, 830 (E.D. Mich. 2000)* (Gadola, J.). *See also Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 888 (6th Cir. 2002)*.

Using [**12] the "relatively slight" threshold standard, *see Welsh, 631 F.2d at 438-39*, the Court must initially examine the first of the two requirements for establishing personal jurisdiction: whether the Michigan long-arm statute supports the Court's exercise of personal jurisdiction. *See Viches, 127 F. Supp. 2d at 830*.

Under the law of the forum where the Court is located, the Michigan long-arm statute permits limited personal jurisdiction over an individual or corporation, enabling the court to render personal judgments against the individual or corporation, when the cause of action arises out of the "transaction of any business within the state." *M.C.L. § 600.705*. This Court has previously noted that the standard of the Michigan long-arm statute is "extraordinarily easy to meet." *Viches, 127 F. Supp. 2d at 830 (Gadola, J.)*. Indeed, the phrase, "any business within the state" has been very broadly interpreted. The Sixth Circuit has held that where a defendant does even the "slightest act of business in Michigan," the first statutory criterion for personal jurisdiction under the Michigan long-arm statute is satisfied. *Lanier v. Am. Bd. of Endodontics, 843 F.2d 901, 906 (6th Cir. 1988)*.

The next [**13] step is to consider whether Defendant has "minimum contacts" with the forum state such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*. The Sixth Circuit has established a three-part test for this analysis. *See Cole v. Miletti, 133 F.3d 433, 436 (6th Cir. 1998); Southern Machine Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381 (6th Cir. 1968)*. First, the defendant must purposefully avail himself of the privilege of conducting activities within the forum state. *Cole, 133 F.3d at 436*. Second, the cause of action must arise from the defendant's activities there. *Id.* Third, the acts of the defendant or consequences caused by the defendant's actions must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant fundamentally fair. *Id.*

## B. Analysis

In the present case, Defendant has transacted business within the State of Michigan, providing sufficient grounds for the Court to exercise personal

495 F. Supp. 2d 645, *652; 2007 U.S. Dist. LEXIS 49547, **13

jurisdiction over him under *M.C.L. § 600.705(1)*. Defendant was recruited and hired out of Plaintiff's Michigan offices. When he was hired [**14] by Kelly, he signed the Agreement containing the non-compete, non-solicit, and non-disclosure clauses, accepting those terms as the terms of his employment with the Michigan headquartered Kelly Services, Inc. Clearly, each of those clauses are meant to protect the interests and information of Michigan based Kelly. Furthermore, during his five year career at Kelly, Defendant attended training sessions in Michigan; Defendant called, faxed, or emailed on weekly or daily basis his Michigan based supervisors; and Defendant routinely accessed information on Kelly's Michigan based computer servers in his efforts to transact business in his position with Kelly. It is information that was obtained in the training sessions, through Kelly's Michigan based servers, and through Defendant's actions with the Michigan company that Kelly now seeks to protect in this action. Additionally, there can be little doubt that Noretto's alleged breach of the Agreement and alleged misappropriation of trade secrets [*653] have a direct effect on Michigan based Kelly Services, Inc. Such contacts are patently sufficient to surmount the "transaction of any business within the state" threshold for personal jurisdiction [**15] under the Michigan long arm statute. *M.C.L. § 600.705. See also ACS Consultant Co. v. Williams, Case No. 06-11301, 2007 U.S. Dist. LEXIS 15120, 2007 WL 674608 at *7 (E.D. Mich. Mar. 5, 2007)*.

Additionally, in his employment with Kelly, Noretto served in a "high level position as Kelly's Regional Manager for the Major Markets Division." Pl.'s Resp. Br., Ex. A, Aff. of Sheen Watkins P 5 [docket entry 17-3, p. 2]. Holding such a managerial position with Kelly, a business with its principal place of business in Michigan, subjects Defendant to the reach of the Michigan long arm statute under *MCL § 600.705(6)*.

Accordingly, because the Court finds that limited personal jurisdiction under the Michigan long arm statute is present, an analysis of whether the Court has general personal jurisdiction is unnecessary. Furthermore, the Court need not consider Plaintiff's argument as to whether Defendant waived any objection to personal jurisdiction. *See Fed. R. Civ. P. 12(h)*.

Turning next to consider whether Defendant has "minimum contacts" such that "the maintenance of the suit does not offend traditional notions of fair play and

substantial justice," *Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95*, the Court finds that Defendant [**16] does have sufficient minimum contacts. Defendant purposefully availed himself of the privileges of conducting activities within the forum state when he became employed by a company headquartered in Michigan; entered into a non-compete, non-solicit, and non-disclosure agreement with Kelly; entered into the Agreement containing a Michigan choice of law provision; continuously reported to supervisors working in Michigan; made several trips to Michigan for training purposes, and frequently used information stored on the company's Michigan based servers. *Cole, 133 F.3d at 436. See also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 482, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)* (finding: (1) that a Florida District Court had personal jurisdiction over a Michigan franchisee whose only contacts with Florida were a franchise agreement with the Florida corporation and communications to Florida via telephone calls and letters and (2) that a choice of law provision should not "be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's law'" for jurisdictional purposes); *Superior Consulting, Inc. v. Walling, 851 F. Supp. 839, 844 (E.D. Mich. 1994)* (finding that an employee that [**17] negotiated an employment contract with a Michigan company, made numerous trips to Michigan while employed, and was in frequent contact with the employer's Michigan office via telephone, voice mail, fax, mail, and e-mail, had sufficient minimum contacts).

Therefore, after a thorough consideration of the matter, the Court finds that the Sixth Circuit's three-part test for determining whether the Court may exercise limited jurisdiction over Defendant in accordance with Due Process is satisfied. *Cole, 133 F.3d at 436.* Plaintiff has presented a prima facie case that Defendant has transacted business in the State of Michigan for the purpose of the Michigan long arm statute and that those acts have given rise to the present action. Additionally, because Defendant "purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Viches, 127 F. Supp. 2d at 830-31* (quoting *Int'l Shoe Co., 326 U.S. at 316*), he created minimum contacts with Michigan such that the "maintenance of the suit does not offend traditional notions [*654] of fair play and substantial justice." *Int'l Shoe Co., 326 U.S. at 316.*

Accordingly, [**18] the Court will deny Defendant's

495 F. Supp. 2d 645, *655; 2007 U.S. Dist. LEXIS 49547, **21

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

training in this district. Both actions, Kelly maintains, provided Defendant with the confidential information and trade secrets now at the center of this litigation. Additionally, Defendant acquired information subject to this suit by using Kelly's Michigan based servers. Finally, as part of Defendant's employment, he entered into a non-compete, non-solicit, and non-disclosure agreement with the Michigan company. It is that Agreement that is now central to this dispute.

Although it is clear that there may be [**22] substantial events that occurred in Oregon that are relevant to this dispute, the facts indicate that "a substantial part of the events" and the property at the heart of the dispute are centered in the Eastern District of Michigan. Accordingly, Defendant has not met his burden of demonstrating that venue is improper; venue is proper in this district and the Court will deny Defendant's motion to dismiss or transfer the action.

## V. Preliminary Injunction

### A. Legal Standard

The decision of whether or not to issue a preliminary injunction lies within the sound discretion of the district court. *Golden v. Kelsey-Hayes, 73 F.3d 648, 653 (6th Cir. 1996)*, cert. denied, *519 U.S. 807, 117 S. Ct. 49, 136 L. Ed. 2d 13 (1996)*. The Supreme Court and the Sixth Circuit have noted that "the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981); Six Clinics Holding Corp., II v. Cafcomp Sys., Inc., 119 F.3d 393, 400 (6th Cir. 1997). See also Ramik v. Darling Intern., Inc. 161 F. Supp. 2d 772, 778 (E.D. Mich. 2001)* (Gadola, J.) ("The [**23] purpose of a preliminary injunction is to preserve the status quo for trial."). The Sixth Circuit, however, has advised that "a preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Co. Gov't, 305 F.3d 566, 573 (6th Cir. 2002)* (citation omitted). Additionally, this "extraordinary" remedy "should best be used sparingly." *Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C., 966 F. Supp. 540, 541 (E.D. Mich. 1997)* (Gadola, J.) (citations omitted).

When considering whether to grant the "extraordinary" remedy of a preliminary injunction, a district court must consider and balance four factors: (1) whether the moving party has a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable injury [*656] without the preliminary injunction; (3) whether issuance of the preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the preliminary injunction. *Jones v. City of Monroe, 341 F.3d 474, 476 (6th Cir. 2003)* (citations omitted); *Memphis Planned Parenthood, Inc. v. Sundquist, 175 F.3d 456, 460 (6th Cir. 1999); [**24] Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n, 110 F.3d 318, 322 (6th Cir. 1997); In re De Lorean Motor Co., 755 F.2d 1223, 1228 (6th Cir. 1985).* These four factors "are factors to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condo. Ass'n, 328 F.3d 224, 230 (6th Cir. 2003)* (citation omitted). A district court must make specific findings concerning each of the four factors unless fewer are dispositive of the issue. *Performance Unlimited v. Questar Publishers, Inc., 52 F.3d 1373, 1381 (6th Cir. 1995); Jones, 341 F.3d at 476* (citations omitted) (a court "is not required to make specific findings concerning each of the four factors used in determining a motion for a preliminary injunction if fewer factors are dispositive of the issue.").

### B. Analysis

Kelly maintains that it is likely to succeed on the merits of the action against Noretto for the breach of the Agreement because Noretto has misappropriated Kelly's trade secrets and violated the terms of the Agreement when he began working for Volt, a direct competitor of Kelly, in the same geographic market area as Noretto was responsible for when he was employed with Kelly. Additionally, [**25] Kelly asserts that Noretto violated the Agreement when, while working for Volt, he had contact with a customer with which Noretto had significant contact with while employed with Kelly. Furthermore, Kelly contends that because of the information possessed by Defendant as a result of his managerial position, he has violated the MUTSA in using that information for his benefit and the benefit of Volt.

Defendant maintains that Kelly is not likely to succeed on the merits of this suit. Defendant readily admits that he voluntarily resigned from Kelly, but he argues, he resigned from Kelly only because he was in

495 F. Supp. 2d 645, *656; 2007 U.S. Dist. LEXIS 49547, **25

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

imminent danger of being fired. Defendant also admits that he performed certain specific work for the Plaintiff in segments of the geographic area as alleged by Plaintiff. Defendant argues however, that he has taken no action to utilize any "secret information" or customer lists to further the interests of himself or his new employer. Furthermore, Defendant argues that it is unreasonable that he be prevented from working within the staffing industry considering that there are more than 200 competitors of Kelly within the geographic area alleged. Defendant argues that because he has [**26] more than twenty-one years of experience in the field it would be unduly burdensome to force him to find other employment.

With the above legal standard in mind, the Court now undertakes an analysis of each of the factors for a preliminary injunction based upon the facts as presented to the Court.

1. Strong Likelihood of Success on the Merits

a. Non-Compete Agreement

In the present case, Defendant has not disputed the existence of the Agreement or its non-compete clause, non-solicit, or non-disclosure clauses. Therefore, the Court need not examine the validity of the Agreement's existence or its facial applicability to Defendant. The Court therefore focuses its inquiry on whether the non-compete clause is applicable to Defendant under Michigan law. Under Michigan law, a non-compete agreement [*657] is enforceable as long as: (1) it is reasonably drawn as to its duration, geographical scope, and line of business; and (2) it protects the legitimate business interest of the party seeking its enforcement. *Lowry Computer Products, Inc. v. Head, 984 F. Supp. 1111, 1113 (E.D. Mich. 1997)* (Gadola, J.)

The Court begins by examining whether the Agreement is reasonably drawn in terms of its geographic and [**27] temporal restriction. Under the Agreement, Noretto is restricted from competing with Kelly and from soliciting Kelly's customers and employees for a period of one year from the termination of his employment, within the geographic market area in which he worked or had responsibility during the last five years of his employment with Kelly. There is no dispute that Noretto held responsibility for Multnomah, Clackamas, Washington, Columbia, Clatsop, Marion, Yamhill, Linn, Tillamook, Lincoln and Wasco counties in the State of

Oregon, as well as Clark, Skamania, and Cowlitz counties, in the State of Washington.

Courts within Michigan have consistently held that non-compete agreements with one-year durations-such as the one at issue here-are reasonable and enforceable. *See, e.g., Lowry, 984 F. Supp. at 1116* (finding a one year restriction reasonable and emphasizing that "as to duration, courts have upheld time periods of six months to three years."); *Bristol Window & Door, Inc. v. Hoogenstyn, 250 Mich. App. 478, 650 N.W.2d 670 (Mich. Ct. App. 2002)* (enforcing a three-year, statewide non-competition agreement). Accordingly, the Court finds that the duration of the Agreement is reasonable.

Turning to the geographic [**28] restriction contained in the Agreement, the Court finds that the restriction is not unreasonable given the facts of the case. Kelly Services, Inc. is an international corporation with broad business interests in each of the areas it services. However, the agreement limits Noretto only from working for a direct competitor in the specific geographic area in which he worked or had responsibility during the last five years of his employment. In the present case, Noretto would be limited from working for a competitor of Kelly only within certain specific counties of Oregon and Washington. Such a geographic restriction, given the vast scope of Kelly's business interests, is not inherently unreasonable.

Next, turning to the second factor, whether the non-compete agreement protects the legitimate business interests of the moving party, the case law strongly supports the conclusion that Kelly has a legitimate business interest in restricting its former employees from soliciting its customers and in protecting confidential and proprietary information such as customer lists, profit margins, corporate strategies, and pricing schemes. *See Lowry Computer Products, Inc., 984 F. Supp. at 1116; Superior Consulting Co. v. Walling, 851 F. Supp. 839, 847-48 (E.D. Mich. 1994); [**29] Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran, 67 F. Supp. 2d 764, 775 (E.D. Mich. 1999).* Accordingly, Plaintiff has presented a strong likelihood of success on the merits its claim under the Agreement.

b. Michigan Uniform Trade Secrets Act

Plaintiff has also sought relief under the Michigan Uniform Trade Secrets Act ("MUTSA"), *M.C.L. § 445.1901, et seq.,* a statute that explicitly provides for

495 F. Supp. 2d 645, *657; 2007 U.S. Dist. LEXIS 49547, **29

injunctive relief. See M.C.L. § 445.1903(1); CMI Int'l., Inc. v. Internet Int'l Corp., 251 Mich. App. 125, 649 N.W.2d 808, 813 (Mich. Ct. App. 2002) (finding that, under MUTSA, "A court can enjoin actual or threatened misappropriation of a trade secret [*658] and can also compel affirmative acts necessary to protect a trade secret." (citations omitted)). Information constitutes a protectable trade secret under the MUTSA if the information derives independent economic value from not being generally known to others and the employer took reasonable steps to protect the confidentiality of the information. See M.C.L. § 445.1902. Courts have found that information such as a brokerage firm's customer lists were trade secrets for the purpose of MUTSA. See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran, 67 F. Supp. 2d 764, 775 (E.D. Mich. 1999). [**30] Although Defendant correctly notes that this very Court, in Raymond James & Assocs. v. Leonard & Co., 411 F. Supp. 2d 689, 697-98 (E.D. Mich. 2006)(Gadola, J.), previously found that customer lists were not trade secrets under the MUTSA, the case of Raymond James is factually distinct from the present one.

In Raymond James, the defendant was a former employee of the plaintiff brokerage firm. Upon resignation, the defendant immediately began soliciting clients that he had formerly served while employed with Raymond James then began to service those customers accounts under his new employer. In that case the Court found that the plaintiff was not likely to succeed on the merits of its MUTSA claim for protection of the customer lists as trade secrets. Id. at 698. However, distinct from the facts of this case, the customer lists in Raymond James were actually created and maintained by the defendant. Therefore the Court found that the lists were not the trade secrets of the brokerage firm. Furthermore, the plaintiff in Raymond James failed to take reasonable efforts to maintain the secrecy of the information at issue. See Raymond James, 411 F. Supp. 2d at 693-94. [**31] Finally, the defendant in Raymond James was not subject to a non-disclosure, non-compete, or non-solicit contract. See Raymond James, 411 F. Supp. 2d at 696.

In the present case, Defendant is allegedly subject to a non-compete, non-disclosure, and non-solicit Agreement. Plaintiff seeks protection of its customer and prospective customer lists among other sensitive information such as its regional pricing policies and profit margins, specific details of its customer contracts and

Kelly's strategic plans and marketing plans. Defendant acquired or was given access to this information by Kelly through his position as a manager with the company. Unlike Raymond James however, Defendant makes no claim that he acquired personal ownership over any of this information. Accordingly, the rationale used to exclude the customer lists at issue in Raymond James is inapplicable in this case.

Defendant also argues the Plaintiff cannot prevail on a MUTSA claim because all of the information central to this suit was made available to Defendant through his employment and was readily available to every Kelly Services employee. Therefore, Defendant maintains, the information was not subject to reasonable efforts [**32] by Plaintiff to protect its confidentiality. The court finds these arguments untenable at this stage of the proceedings for several reasons. First, the fact that the information was made available to Defendant through his employment is of no assistance to Defendant's claims. It is the fact that Defendant had access to this information through his employment and position-and not other means-that places it under the MUTSA. See M.C.L. § 445.1902(d); Raymond James, 411 F. Supp. 2d at 694; Hayes-Albion v. Kuberski, 421 Mich. 170, 364 N.W.2d 609, 614-15 (Mich. 1984). Second, Defendant's contention that the information at issue is readily known by, and available to, all the Kelly employees is unpersuasive. Defendant was a regional [*659] manager for Kelly, responsible for a multi-county area of both Washington and Oregon. Defendant admits that immediately preceding his departure from employment with Plaintiff, he closed a deal worth six-million dollars. Such facts indicate that Defendant had significant responsibility while employed with Kelly. Kelly has attested that access to information within the company is limited according to the position of the employee and that access is provided only on a need-to-know [**33] basis through its password protected system. Accordingly, the Court finds that Plaintiff has presented sufficient information supporting its contention that the information constitutes protectable trade secrets that it took reasonable steps to protect. See M.C.L. § 445.1902.

Therefore, based upon the facts as now presented to the Court, it appears there is a substantial likelihood that Plaintiff will succeed in proving that Noretto violated the terms of the Agreement and violated the Michigan Uniform Trade Secrets Act. Plaintiff has satisfied the first prong of the preliminary injunction analysis.

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

495 F. Supp. 2d 645, *659; 2007 U.S. Dist. LEXIS 49547, **33

Page 10

## 2. Irreparable Harm

Kelly argues that it will suffer irreparable harm if a preliminary injunction is not granted because Noretto will continue to use Kelly's confidential information and trade secrets in violation of his contractual responsibilities to Kelly. The Court agrees.

It is well settled in the Sixth Circuit that "[a]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992).* The loss of goodwill from existing and prospective customers has been held [**34] to be irreparable by the Sixth Circuit. *Id. at 512.* ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."); *Michigan Bell Tel. Co. v. Engler, 257 F.3d 587, 599 (6th Cir. 2001).* "Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Basicomputer Corp., 973 F.2d at 512* (citing *Overholt Crop Ins. Serv. Co. v. Travis, 941 F.2d 1361, 1371 (8th Cir. 1991)* (holding that irreparable harm can be inferred from insurance sales representatives' breach of non-competition covenant)).

In this Court's estimation, it is entirely unreasonable to expect Noretto to work for a direct competitor in a position similar to that which he held with Kelly, and forego the use of the intimate knowledge of Kelly's business operations. *See Lowry, 984 F. Supp. at 1116* (Defendant's knowledge is "bound to have significant adverse impact on [Plaintiff's] business."); *Walling, 839 F. Supp. at 847-48* (finding that "use of this knowledge [confidential client information] would enable [Defendant] effectively to undercut [Superior's] rates while providing [**35] the same services provided by [Superior]."). Absent an order for preliminary injunction, it appears that Defendant's expansive knowledge of Kelly's business systems and operations will result in a loss of the customer goodwill developed by Kelly. Furthermore, Kelly will be forced to labor under the burden of unfair competition as a result of the informational asymmetry presented by its direct competitor having an employee with intimate knowledge of its operations. Because the resulting losses suffered by Kelly are so indefinite and speculative in scope, the harm is irreparable. *See, Chem-Trend, Inc. v. McCarthy, 780 F. Supp. 463 (E.D. Mich. 1991)*; *Walling, 851 F. Supp. at*

*847; Basicomputer Corp., 973 F.2d at 511-12.* As a result, Plaintiff has [*660] satisfied the second prong of the preliminary injunction analysis.

## 3. Whether there will be Substantial Harm to Others

An inquiry into whether there will be substantial harm to others is a fact-based inquiry. *Curtis 1000, Inc. v. Martin, 197 Fed. App'x. 412, 426 (6th Cir. 2006).* In the present case, Defendant has not presented any credible evidence that there will be substantial harm to the general public. Indeed, as discussed below, the general public [**36] appears to have a strong interest in the issuance of preliminary injunction in the present situation.

In consideration of this factor, the Court has also considered the harm that may be inflicted upon Defendant by the issuance of a preliminary injunction. *See Curtis 1000, Inc., 197 Fed. App'x. at 426* (finding that the term "others" may include the defendant). The Court recognizes that if the injunction requested by Plaintiff is issued, Defendant will be unable to continue in his current position with Volt within the Portland office for the remainder of the term set forth in the Agreement or until this case is otherwise resolved in his favor. However, Defendant's potential harm is substantially mitigated for several reasons. First, under the terms of the agreement, the restriction on Defendant's employment with direct competitors is limited to the geographic area in which he held responsibility while with Kelly. Defendant is not restricted from working for a direct competitor, such as Volt, if his employment does not encompass any of the geographic region for which he was responsible in his employment with Kelly. Accordingly, although Defendant admits he has until now restricted his [**37] job search to the Portland area because he does not want to move his family, Defendant could comply with the terms of the Agreement and substantially mitigate any harm by simply by moving to a different geographic area. Additionally, Defendant could mitigate any potential harm simply by seeking employment in another industry. Defendant's testimony indicates during the course of his employment he has been a successful and self-motivated employee that has been able to rise through the ranks of various corporations. Under the terms of the agreement Defendant is unrestricted in applying his skill set to any position outside of the staffing industry, whether the position is located in his preferred location of Portland, Oregon or anywhere else. Finally, the restrictions

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Page 11

495 F. Supp. 2d 645, *660; 2007 U.S. Dist. LEXIS 49547, **37

Defendant now argues are unduly burdensome are those terms that he agreed to as part of his employment with Kelly. The Court is reluctant to find that terms Defendant *voluntarily* agreed to in an effort to secure a position with Kelly are now unduly burdensome simply because he chose to resign from Kelly.

In summation, although the Court is sympathetic to Defendant's desire to retain his position with Volt in the Portland [**38] office, and to refrain from uprooting his family from the area, given the facts of the case as now presented to the Court, the Court is unable to reconcile Defendant's desires with the applicable law. Phrased another way, although Defendant may not be able to pursue his first choice with respect to an employment position or location, Defendant can readily comply with the terms of the Agreement and find a suitable employment position. Therefore, absent any demonstration of any harm to the public, and given that Defendant can substantially mitigate any potential harm that he may incur, the Court finds that Plaintiff has satisfied the third prong of the preliminary injunction analysis.

### 4. Whether the Public Interest will be Served by a Preliminary Injunction

The Court finds that this factor weighs heavily in favor of Plaintiff. It is axiomatic [*661] that the public has an interest in the enforcement of the legislatively enacted laws. Such an interest surely extends to the enforcement of the Michigan Uniform Trade Secrets Act, an act that prevents disclosure of trade secrets and explicitly provides for injunctive relief in instances of actual or threatened misappropriation of trade secrets. *See* [**39] M.C.L. § 445.1903(1); *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 251 Mich. App. 125, 649 N.W.2d 808, 813 (Mich. Ct. App. 2002). Additionally, there can be little doubt that public has a substantial interest in the enforcement of valid contractual obligations. *See, e.g. Walling*, 851 F. Supp. at 848. In the present case, Defendant readily admits that he was in violation of the Agreement's provision prohibiting him from associating with a direct competitor of Kelly for one year following his resignation. Based on such considerations, the Court finds that Plaintiff has satisfied the fourth prong of the preliminary injunction analysis.

Therefore, cognizant that the "extraordinary" remedy of a preliminary injunction should be used sparingly, *Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.*, 966 F. Supp.

540, 541 (E.D. Mich. 1997) (Gadola, J.) (citations omitted), after a full consideration of the facts as presented to the Court and a careful consideration of each of the four factors necessary for a preliminary injunction, the Court finds that Plaintiff has carried its burden. The circumstances as demonstrated to this Court clearly demand that a preliminary injunction be issued, *Overstreet v. Lexington-Fayette Urban Co. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) [**40] (citation omitted), so that the relative positions of the parties can be preserved until a trial on the merits can be held. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981); *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997).

### VI. Bond

Finally, *Rule 65 of the Federal Rules of Civil Procedure* requires that:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

*Fed. R. Civ. P. 65(c)* (emphasis added).

Application of *Rule 65(c)* has been construed by the Sixth Circuit as being within the sound discretion of the trial judge. *Urbain v. Knapp Bros. Mfg. Co.*, 217 F.2d 810 (6th Cir. 1954). However, failure to consider the question of security has been considered error by the Sixth Circuit. *Beukema's Petroleum Co. v. Admiral Petroleum Co.*, 613 F.2d 626, 629 (6th Cir. 1979). The sum posted on bond should reflect the damages that may be incurred by a wrongfully enjoined party. *Fed. R. Civ. P. 65(c)*. In the present [**41] case, Plaintiff posted a bond of $ 10,000 upon issuance of the initial temporary restraining order. When considering the amount of the bond necessary at that time, the Court reasoned that because Defendant would not suffer total deprivation of his ability for gainful employment but would only suffer some potential diminution of wages based upon the temporary nature of the initial injunctive relief, the Court found a bond of $ 10,000 appropriate.

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

495 F. Supp. 2d 645, *661; 2007 U.S. Dist. LEXIS 49547, **41

Page 12

Now, Defendant is facing an injunction of much longer duration and a bond of a more substantial sum is appropriate. After consultation between the parties, each side agreed that a total bond of $ 50,000 is appropriate. The Court agrees and will order Plaintiff Kelly Services, Inc., to post an additional $ 40,000 bond, in addition to [*662] the $ 10,000 already posted, as security for the preliminary injunction.

## VII. Conclusion

ACCORDINGLY, IT IS HEREBY ORDERED that Defendant Noretto's motion to dismiss for lack of personal jurisdiction [docket entry # 11] is DENIED.

IT IS FURTHER ORDERED that Defendant Noretto's motion to dismiss or transfer for improper venue [docket entry # 11] is DENIED.

IT IS FURTHER ORDERED that Plaintiff Kelly Services, Inc., is [**42] granted a preliminary injunction, EFFECTIVE IMMEDIATELY and REMAINING IN EFFECT until MAY 4, 2008 or until this matter is otherwise resolved by the Court.

IT IS FURTHER ORDERED that Defendant NED NORETTO is ENJOINED from directly or indirectly:

(a) working for, or acting as, an employee, partner, stockholder, investor, owner, director, agent, or consultant for a competitor of Kelly (including, but not limited to, Volt) within Multnomah, Clackamas, Washington, Columbia, Clatsop, Marion, Yamhill, Linn, Tillamook, Lincoln and Wasco Counties, in the State of Oregon and Clark, Skamania, and Cowlitz Counties in the State of Washington;

(b) soliciting or performing services for any Kelly customer for a competing business;

(c) soliciting or being involved in the recruitment or hire of any Kelly employee for a competing business (including but not limited to Volt) until;

(d) using or disclosing any of Kelly's confidential, proprietary or trade secret information or property;

(e) interfering, in any way, with any current or prospective customer or employee relationship of Kelly;

(f) disclosing or using Kelly's confidential or proprietary information. [2]

---

[2] The Court declines to adopt the entirety of Plaintiff's [**43] proposed item (f), enjoining Defendant from breaching any fiduciary obligations or duties owed to Plaintiff, because Plaintiff has not presented any argument related to that relief. Nevertheless, the Court's failure to adopt that language should not be construed by any party as a grant of authority to violate any other term of this order or of the Agreement.

IT IS FURTHER ORDERED that Defendant return all Kelly property now in his possession to Kelly, no matter what form that property is maintained, no later than Thursday, July 19, 2007.

IT IS FURTHER ORDERED that Defendant must PRESERVE all evidence, including hard copies, electronic, computer or any other format, that relates in any way to the claims made in this case.

IT IS FURTHER ORDERED that Plaintiff shall post a bond of $ 50,000 with the Clerk of the Court, no later than close of business, Friday, July 13, 2007. The Court duly recognizes that Plaintiff previously posted bond in the amount of $ 10,000 with the Clerk of the Court upon issuance of the June 6, 2007 Temporary Restraining Order. Accordingly, Plaintiff need only post an additional bond in the amount of $ 40,000 to satisfy the $ 50,000 total amount now required by the [**44] Court. The total bond of $ 50,000 shall REMAIN IN EFFECT until the automatic dissolution of the preliminary injunction on May 4, 2008, or until this matter is otherwise resolved.

SO ORDERED.

Dated: July 9, 2007

HONORABLE PAUL V. GADOLA

UNITED STATES DISTRICT JUDGE

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

LEXSEE 530 F SUPP 2D 940

**KELLY SERVICES, Plaintiff, v. CYNTHIA EIDNES, Defendant.**

Civil No. 07-14989

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION

*530 F. Supp. 2d 940; 2008 U.S. Dist. LEXIS 1799*

January 10, 2008, Decided
January 10, 2008, Filed

COUNSEL: [**1] For Kelly Services, Incorporated, Plaintiff: James J. Giszczak, LEAD ATTORNEY, Katherine D. Goudie, Butzel Long (Detroit), Detroit, MI.

For Cynthia Eidnes, Defendant: Anne Bagno Widlak, Michael P. Donnelly, Fraser, Trebilcock, Detroit, MI.

JUDGES: Hon. John Feikens, United States District Judge.

OPINION BY: John Feikens

OPINION

[*944]   OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Before this Court are Plaintiff Kelly Services Inc.'s (Kelly) motion for a preliminary injunction, pursuant to *Fed. R. Civ. P. 65(a)*, and Defendant Cynthia Eidnes's (Eidnes) motions to dismiss for lack of subject matter jurisdiction, pursuant to *Fed. R. Civ. P. 12(b)*1); for lack of personal jurisdiction, pursuant to *Fed. R. Civ. P. 12(b)(2)*; for failure to state a claim, pursuant to *Fed. R. Civ. P. 12(b)(6)*; as well as Eidnes's motion to dismiss or transfer for improper venue, pursuant to *28 U.S.C. §§ 1391, 1404*. For the reasons explained below, this Court GRANTS Plaintiff's motion for a preliminary injunction, and DENIES Defendant's motions to dismiss and transfer venue.

I. Background Information

A. Factual Information

Plaintiff Kelly Services is a Delaware corporation with its principal [**2] place of business in Troy, Michigan. Defendant Cynthia Eidnes is a citizen and resident of Minnesota. Eidnes is a Stanford Law School graduate who began in the legal staffing business in November 1993 when she joined the Wallace Law Registry. Both parties agree she was very successful in this industry, developing contacts throughout the Minneapolis legal market and establishing a market niche for temporarily placing attorneys for discrete projects.

[*945] Eidnes's employment with Kelly Services began the day Kelly Services bought the Wallace Law Registry in May 1995. Without any previous presence in the Minneapolis legal market, Kelly Services relied heavily on Eidnes to continue her success, which she did with the vast majority of her work confined to the greater Minneapolis area. [1] On May 1, 2000, Eidnes signed a document entitled "Agreement with Full-Time Employees of Kelly Corporation." [2] (Agreement). As relevant to this litigation, the Agreement contained the following non-competition, non-solicitation clauses which were included as consideration for her employment with Kelly Services.

(1) . . . I will never disclose, use, copy, or retain any confidential business information or trade [**3] secrets belonging to Kelly, Kelly's customers, or Kelly's suppliers. This includes customer and employee lists; sales, service,

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Page 2

530 F. Supp. 2d 940, *945; 2008 U.S. Dist. LEXIS 1799, **3

recruiting and training techniques and manuals; sales and marketing strategies; computer programs; financial date and other similar information.

(2) While I am working for Kelly, I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner, stockholder, investor, agent or consultant. These same limitations apply for one year after I leave Kelly in any market area in which I worked or had responsibility during the past five years of my employment with Kelly.

1  For the purposes of this lawsuit, Kelly Services asks that Eidnes be limited from competing with it in Hennepin, Ramsey, Dakota, Anoka, Scott, Carver, Washington, Stearns, and Blue Earth Counties.
2  It is uncontested that Eidnes was obligated to a similar agreement that restricted her for a two year span when she was employed by Wallace Law Registry.

On October 31, 2007, Eidnes informed her immediate supervisor that it would be her last day with Kelly Services. She gave [**4] no indication why she was quitting or who she would be working for in the future. It was only after reviewing the website of Beacon Hills, a direct competitor of Kelly's, that it was discovered that Eidnes had left to become the Beacon Hills Legal Division Director.

Kelly alleges that as part of her employment and because of the nature of her position with Kelly, Eidnes had access to and regularly utilized Kelly's trade secrets and confidential information, including its customer lists, marketing and sales strategies, contractual details for its customers, regional pricing lists and profit margins. Kelly also alleges that Eidnes had at least semi-regular access to this information through Kelly's Troy based computer system. As a result of these development, Kelly claims Eidnes is in violation of the Agreement she signed and that she is in violation of the Michigan Uniform Trade Secrets Act (MUTSA), *M.C.L. § 445.1901 et. seq.* As a

result, Kelly fears that Eidnes will use its trade secrets and confidential information unlawfully and that as a result, it will lose the value of this information as well as customers, clients and revenues.

**B. Procedural Information**

On December 6, 2007, following [**5] arguments on Plaintiff's motion for a Temporary Restraining Order, this Court issued an order restraining Defendant Eidnes from working for a Kelly Services competitor in the Minneapolis area legal staffing [*946] market until further notice of this Court. Plaintiff now seeks a preliminary injunction that retrains or enjoins Defendant Eidnes from violating its agreement with Eidnes until November 1, 2008.

Defendant has also filed her own motions. First, Eidnes claims this court does not have subject matter jurisdiction over these facts because the dispute does not amount to $ 75,000 of damages which is required in a diversity jurisdiction matter such as this. Second, Eidnes argues this court does not have personal jurisdiction over her because she lacked contact with Michigan, other than incidental contacts that bear no relationship to these events. Third, Eidnes argues that Plaintiff failed to state a claim because of the general nature of its complaint. Finally, Eidnes claims the venue chosen is improper because the events and conduct at issue occurred in Minnesota, not Michigan. In the alternative, Eidnes asks that this court to transfer venue to Minnesota as a matter of convenience.

The [**6] Court will address Defendant's Motions first, and then address Plaintiff's Motion for a Preliminary Injunction.

**II. Subject Matter Jurisdiction**

Eidnes argues that this court does not have subject matter jurisdiction because the damages alleged are indefinite and not readily ascertained, pursuant to *Federal Rules of Civil Procedure 12(b)(1)*. Subject matter jurisdiction based on diversity citizenship requires $ 75,000 to be at stake, exclusive of attorney fees and court costs. When the amount in controversy is challenged by the Defendant, the Complaint will be dismissed only "if it appears to a legal certainty that the plaintiff in good faith cannot claim the jurisdiction amount." *Massachusetts Cas. Ins. Co. v. Harmon, 88 F.3d 415, 416 (6th Cir. 1996)* Plaintiff is not required to show an absolute

530 F. Supp. 2d 940, *946; 2008 U.S. Dist. LEXIS 1799, **6

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

certainty that it will be entitled to a verdict in excess of $ 75,000. Instead, there must be a legal certainty that Plaintiff will not recover that amount for this matter to be dismissed for lack of subject matter jurisdiction. *Olden v. LaFarge Corp.*, 203 F.R.D. 254, 259-60 (E.D. Mich. 2001)(Lawson, J.)

I cannot conclude that there is a legal certainty that Plaintiff will not be able to recover [**7] more than $ 75,000 in damages. If Defendant were allowed to work in the Minneapolis market, based upon the affidavits submitted by both parties to this Court, it is very conceivable that it would only take several customers or contracts before Plaintiff sustained over $ 75,000 in lost business. It is undisputed that Eidnes is very capable and successful. Losing her services in violation of the agreement that she made with Plaintiff would almost certainly cause damages in excess of $ 75,000. I therefore, DENY Defendant's motion to dismiss for lack of subject matter jurisdiction.

### III. Personal Jurisdiction

Eidnes moves to dismiss this case for lack of personal jurisdiction, pursuant to *Fed. R. Civ. P. 12(b)(2)*. She argues that she is a resident of Minnesota and has come to Michigan once, for a training session entirely unrelated to her job with Kelly Services. Moreover, she claims that the events and facts of this case occurred in Minnesota, and not Michigan.

Plaintiff bears the burden of establishing personal jurisdiction. *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002). When the evaluation of personal jurisdiction is made without an evidentiary hearing, the Plaintiff "need only make [**8] a prima facie showing of jurisdiction." *Id. at 871*. The Sixth Circuit has instructed this Court to consider the pleadings and affidavits in a light most favorable to the Plaintiff. [*947] Plaintiff's burden is "relatively slight." *Kelly Services, Inc. v. Noretto, 495 F. Supp. 2d 645, 651 (E.D. Mich. 2007)* (Gadola, J.) [3]; *McCuiston v. Hoffa, 313 F.Supp.2d 710, 715 (E.D. Mich. 2004)*(Feikens, J.).

> 3   The *Noretto* case bears striking similarities with the events of this matter. The contract at issue in both cases is identical, issued by Plaintiff Kelly Services to all of its employees. Defendant Eidnes is also very similar to Noretto. Although the defendants were in different sales areas, they were nonetheless high ranking salespeople for

Kelly Services who used confidential information and trade secrets possessed by Kelly Services to accomplish their jobs. As such, *Noretto* served to assist this Court in evaluating the facts of this matter and the issues of law that were applied in each case.

To establish personal jurisdiction in this district, Plaintiff must show that (1) Michigan's long-arm statute supports this court's exercise of personal jurisdiction, and (2) that the *Due Process Clause of the Fourteenth Amendment* [**9] is not violated by that exercise. *Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 888 (6th Cir. 2002); Niemi v. NHK Spring Co. Ltd., 276 F.Supp.2d 717, 719-20 (E.D. Mich. 2003)*(Feikens, J.) The first requirement is uncontested, and, in any event, that standard of the Michigan Long Arm Statute is "extraordinarily easy to meet." *Noretto, 495 F. Supp. 2d at 652*. The slightest act of business meets this standard, and that is conceded by both parties as both cite to a training meeting Eidnes attended at Kelly Services' Troy Headquarters. Further, Defendant signed the contract to work for Michigan based Kelly Services which is at issue in this matter.

The second step ascertains whether Defendant has the requisite minimum contacts with this state so that personal jurisdiction over the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*. The Sixth Circuit has instructed this Court to apply a three-part analysis in determining this analysis. First, Plaintiff must show that Defendant purposefully availed herself of the privilege of conducting activities in Michigan (the forum state). Second, the cause of action [**10] must come out of those activities. Third, there must best be a connection between Defendant's activities and the forum state to make the exercise of jurisdiction fundamentally fair. *Cole v. Mileti, 133 F.3d 433, 436 (6th Cir. 1998.)*

In this instance, the evidence viewed in a light most favorable to Plaintiff shows that Eidnes accessed a Michigan-based computer server and database networks as part of her job responsibilities. *See ACS Consultant v. Williams, 2007 U.S. Dist. LEXIS 15120 (Zatkoff, J.)*(March 5, 2007)(use of Michigan based computer services is sufficient to establish personal jurisdiction in Michigan, even though Defendant's physical presence is in another state). Further, as evidenced by the emails and

530 F. Supp. 2d 940, *947; 2008 U.S. Dist. LEXIS 1799, **10

phone logs produced by Plaintiff, it is clear that there is at least a prima facie showing that Eidnes had at least semi-regular contact with Michigan-based supervisors during the course of her employment with Kelly Services.*See Kelly Services v. Noretto, 495 F. Supp. 2d at 652-53.* From these facts, it is clear to this Court that Eidnes purposefully availed herself of the privileges of conducting activities in Michigan. Maintaining this suit in this Court will not offend [**11] the tradition notions of fair play and substantial justice. Accordingly, Defendant's Motion to Dismiss for lack of personal jurisdiction is DENIED.

### IV. Failure to State a Claim

Eidnes also moves to Dismiss this matter for failure to state a claim, pursuant [*948] to *Fed. R. Civ. P. 12(b)(6).* A motion to dismiss under *Rule 12(b)(6)* may be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984).* In reviewing this motion, this Court "must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief." *Ziegler v. IBP Hog Mkt. 249 F.3d 509, 512 (6th Cir. 2001).*

Eidnes claims that Plaintiff has made mere accusations and bald assertions regarding the confidential information and trade secrets that Plaintiff fears will be used by Eidnes in her employment for a competitor. This Court disagrees. Paragraph 14 of the Complaint spells out clearly enough without divulging its content, [**12] the exact nature of these trade secrets and confidential information. Specifically they include customer lists and leads; operational procedures and strategic planning; employee information; marketing and sales strategies and practices; customer pricing, contractual details for customers, customer profits, customer needs, training methods and needs; recruiting and resourcing details and information; and the weaknesses and strengths of KLR's services. If it is proven that Defendant Eidnes had access to this information, the relief can be granted.

Eidnes also argues that Plaintiff merely parrots the MUTSA in alleging that it took reasonable steps to protect this information. Regardless of whether Plaintiff does so or not, Plaintiff has alleged that it takes

reasonable steps to protect this information such as password protection, access on a need-to-know basis, and the use of non-compete, non-solicit employment contracts. Just as important, that it did so with Eidnes, Assuming this is true, as this Court should, Plaintiff can recover damages based on these facts.

Finally, Eidnes argues that Plaintiff has not specifically pled what information was taken by Eidnes. Again this Court disagrees. [**13] It is a very reasonable to conclude that if Eidnes had access to this information that she can recall at least some of it in her mind, without having access to it on paper copy or through computer archives. This is part of the justification for non-compete, non-solicit employment agreements: to reasonably protect the employer from the risk that an employee could move to a competitor and use private information against her former employer. For these reasons, the Court DENIES Defendant's Motion to Dismiss for failure to state a claim.

### V. Improper Venue

Defendant next moves to dismiss this matter for improper venue, or in the alternative, to transfer venue to the District of Minnesota. *See 28 U.S.C. §§ 1391, 1404; Fed. R. Civ. P. 12(b)(3).* In this motion, Eidnes bears the burden of establishing that venue is improper. *Kelly Services v. Noretto, 495 F. Supp. 2d at 654.* To do so, she must demonstrate that a substantial part of the events giving rise to this claim did not occur in the Eastern District of Michigan and that (2) a substantial part of the property that is the subject of the action is not located in the district. *See 28 U.S.C. § 1391(a)(2).* In defining "substantial part," only [**14] a substantial connection to the events in Plaintiff's claim is needed for there to be venue. A substantial connection is sufficient for venue even if a greater part of the events occurred in another venue. *See Amphion* [*949] *Inc. v. Buckeye Elec. Co., 285 F. Supp. 2d 943, 946 (E.D. Mich. 2003)*(Gadola, J.)

As was stated previously in this Court's discussion of personal jurisdiction, there is a substantial connection between Michigan and the alleged events that took place and form the basis of this lawsuit. It is true that Defendant Eidnes spent almost all of her time in Minnesota. Nonetheless, she availed herself of employment with a Michigan headquartered company that apparently required her to interact with its Michigan based computers and Michigan based personnel. *See PML North America v. Hartford Underwriters Ins., 2006*

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

530 F. Supp. 2d 940, *949; 2008 U.S. Dist. LEXIS 1799, **14

U.S. Dist. LEXIS 94456 (E.D. Mich. 2006)(Cleland, J.) Further, the information that Kelly Services seeks to protect is based in Michigan, in Kelly's computer databases which are located in Troy. For these reasons, Defendant Eidnes has not met her burden and the Court DENIES her motion to dismiss this matter for improper venue.

In the alternative, Defendant Eidnes asks this [**15] Court to transfer venue to the District of Minnesota, pursuant to 28 U.S.C. § 1404 because it would be more convenient for the witnesses who will be called to testify during these proceedings. See Midwest Motor Supply v. Kimball, 761 F. Supp. 1361 (S.D. Ohio 1991)(convenience for the witnesses is a primary, if not the preeminent reason for transfer under section 1404).

To transfer an action, Defendant Eidnes must meet three criteria: "(1) the action could have been brought in the transferee district court; (2) a transfer serves the interest of justice; and (3) transfer is in the convenience of the witnesses and parties." McCulston, 313 F. Supp. 2d at 719. The convenience of witnesses has been called "the most powerful factor governing the decision of whether to transfer a case." 17 Moore's Federal Practice, § 111.13[1][f][i]. The determination of relative levels of inconvenience "rest[s] within the sound judicial discretion of the district judge." McCulston, 313 F. Supp. 2d at 719. Transferring venue cannot result in an exchange of inconvenience from one party to the other. Superior Consulting v. Walling, 851 F.Supp. 839, 845 (E.D. Mich. 1994)(Cohn, J.)

Without naming or numbering them, [**16] Defendant Eidnes argues that her material witnesses are the law firms and lawyers she contacted in the Minneapolis area as part of her job responsibilities. However, it is also true that there will be testimony required from witnesses located in Troy, Michigan and that much of the evidence relating to Kelly Services's confidential information is located here in Michigan. As such, a change of venue would only trade inconveniences. As such, I DENY Defendant's Motion to transfer venue.

## VI. Preliminary Injunction

Plaintiff Kelly Services has moved this Court to implement a preliminary injunction to enforce the terms of its non-compete, non-solicit agreement with Defendant Eidnes. I have already issued an ORDER GRANTING

Plaintiff's Motion for a preliminary injunction. The following are the reasons for doing so.

Courts must balance four elements when considering granting injunctive relief: (1) likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities; and (4) the public interest. Henkel Corp. v. Cox, 386 F. Supp. 2d 898, 902 (E.D. Mich. 2005)(Feikens, J.) Courts will not normally grant injunctive relief, however, unless both the likelihood of success on the merits [**17] and irreparable harm prongs weigh in favor of such relief. See, e.g., 13 Moore's Federal Practice § 65.06[1] and [2] (Matthew Bender 3d. [*950] ed.). If the injunction is granted, the moving party must indemnify the restrained party against damages that may be suffered by a wrongly restrained party. Fed. R. Civ. P. 65(c).

### I. Likelihood of Success on the Merits

**A. Did Eidnes breach an enforceable agreement with Kelly Services? It is at least likely that she did.**

Eidnes argues that her employment contract with Plaintiff is unenforceable. Her premise is that this agreement is unenforceable because it keeps her from using business contacts that she personally developed, without Plaintiff's assistance. Eidnes claims that the agreement keeps her from working in a field, the legal staffing field in the Minneapolis area, that she herself developed. According to Eidnes, the information used to solicit sales in this field is not private information in Plaintiff's possession but rather public domain, accessible through sources such as the internet, the Yellow Pages, and Martindale Hubbell.

Under Michigan law, a non competition agreement is enforceable as along as: (1) it is reasonably drawn as to its duration, [**18] geographical scope, and line of business; and (2) it protects the legitimate business interests of the party seeking enforcement. Lowry Computer Products v. Head, 984 F. Supp. 1111, 1116 (E.D. Mich. 1997)(Gadola, J.) Legitimate business interests must include much more than a prohibition on competition; reasonableness is based on several factors such as consideration supporting the contract, economic hardship on the employee, and whether the employer has reasonable competitive interests that need protection. Superior Consulting Comp. v. Walling, 851 F. Supp. 839 (E.D. Mich. 1994)

Case law is clear that the time and geographical

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

530 F. Supp. 2d 940, *950; 2008 U.S. Dist. LEXIS 1799, **18

limitations are reasonable. The limitation is for one year and it includes a nine-county area in Minneapolis. *See Lowry, 984 F. Supp. at 1116* (one year restrictions are reasonable); *Noretto, 495 F. Supp. 2d at 657* (non compete geographic limitations that are restricted to several counties are reasonable).

Further, it seems very likely that Plaintiff will win because it has legitimate business interests at stake. Although it is true that the names of the law firms that are recruited in the legal staffing field are easily accessible in the public domain, Plaintiff [**19] argues that its exposure to damage lies in the trade secrets and confidential information that Defendant Eidnes accessed. The danger to Plaintiff is not in Eidnes's knowledge of the legal staffing field in Minnesota, but rather her knowledge of the details of Kelly Services's pricing schemes, marketing strategies, and price markups (among other things) that she gained as a result of her work for Kelly Services and her access to its Troy based computer databases. Judge Gadola in *Noretto* found that Kelly Services had a legitimate business interest in protecting this information through a non-compete clause. Although Noretto and Eidnes sell to different markets, the principle that Kelly Services uses certain strategies and techniques in its sales remains a concern for it and I am convinced that this information is a legitimate, reasonable concern of Plaintiff's that should be protected.

Further, although Eidnes correctly states that she became employed with Kelly Services through a buyout of her company, as opposed to Noretto who was recruited to join, I fail to see how this negates a voluntarily entered into agreement. Both sides agree that Eidnes is a force in the Minneapolis legal recruiting [**20] market. Were she so concerned at the time she signed the agreement, she had the ability to negotiate and eliminate the non-compete [*951] clause. After all, Eidnes is not a novice; she is a licensed attorney who once worked in a large law firm and is a graduate of the Stanford Law School. More than most people, she was fully aware of her options in regards to this clause and as important, what it meant both when she signed it and when she chose to ignore it and leave Plaintiff for a direct competitor.

**B. Did Eidnes violate the Michigan Uniform Trade Secret Act? It is at least likely that she did.**

Plaintiff argues that Eidnes's use and disclosure of its confidential information is enjoinable under the Michigan Uniform Trade Secrets Act (MUTSA), *MCL § 445.1901 et seq.* This act provides that a court can enjoin the actual or threatened misappropriation of trade secrets and can compel affirmative acts to protect trade secrets. Whether it is a protectable trade secret under the MUTSA depends on if the information has independent economic value because it is generally not known to others and the employer took reasonable steps to protect the confidentiality of the information. Determining whether information [**21] is a trade secret involves a two prong analysis. First, does the information derive independent economic value from not being generally known to others; and, second did the employer take reasonable steps to protect the confidentiality of the information. *MCL § 445.1901 et seq.*

Eidnes is correct to note that customer lists are not trade secrets, especially those lists that are devised by the employee, as in this instance. *See Raymond James & Assoc. v. Leonard & Co., 411 F. Supp. 2d 689, 697-98 (E.D. Mich. 2006)*(Gadola, J.) However, this matter is distinct from the *Raymond James* case because it involves more than the protection of customer lists. Eidnes had access to Plaintiff's pricing schemes, the details of its customer contracts, its markups, employee information, i.e. confidential information that is used to differentiate Plaintiff's services to the Minneapolis legal market from its competitors. Further, Plaintiff apparently took steps to protect this information by making a need-to-know criteria for access to it and by protecting through computer password access. It is clear to me that there is a likelihood that Plaintiff could succeed on the merits of its case were this matter [**22] brought to trial.

*II. Immediate, Irreparable Injury*

Eidnes argues that Plaintiff will not suffer irreparable harm because the damages caused by the breach of the agreement can be compensated with money damages. Defendant Eidnes also points out that the legal staffing market is competitive, constantly changing, and temporary. Its contracts with employers are not long-term contracts, but rather they go from project to project. Eidnes cites to an Illinois state case as support for the notion that competitive activity by a former employee does not necessarily cause irreparable harm.

A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages. *Overstreet v. Lexington-Fayette Urban County Government, 305 F.3d 566, 578 (6th Cir.*

Page 7

530 F. Supp. 2d 940, *951; 2008 U.S. Dist. LEXIS 1799, **22

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

*2002).* Last year, Judge Gadola in *Kelly Services v. Noretto* cited to the Sixth Circuit's teaching that the loss of customer goodwill can be considered irreparable injury because the damages that come from that loss are difficult to estimate. In similar fashion, Judge Gadola also noted that the loss of fair competition that results from the breach of a non-competition clause is also likely to cause an [**23] employer irreparable harm. *Kelly Services v. Noretto, 495 F. Supp. 2d at 659* (citing [*952] *Basicomputer Corp. v. Scott, 973 F.2d 507, 512 (6th Cir. 1992).*

I site to my colleague because the situation he faced in the Noretto case is almost identical to this matter. It is entirely unrealistic to expect Defendant Eidnes to work for a direct competitor in the Minneapolis legal services market and think that she will refrain from using her knowledge of Kelly's Services's trade secrets and confidential information against it in the marketplace. The use of this information is almost certain to result in the loss of customer goodwill because Defendant Eidnes will be able to undercut Kelly Services in the open market. The extent of that damage is indeterminable, but it is damage that will almost certainly happen and is irreparable according to the Sixth Circuit's teachings. I therefore find that Plaintiff has met the second prong of the analysis.

### III. Substantial Harm to Others

Whether there will be substantial harm to others is determined through a fact based inquiry. *Kelly Services v. Noretto, 495 F. Supp. 2d at 660.* In situations where a non-competition clause is enforced through an injunction, there [**24] is harm to the enjoined employee. However, it is also clear to this Court that Defendant Eidnes brought this harm upon herself. She was fully aware of the provisions of her contract, probably more so than most people since she was formally an attorney. By breaking her agreement, Eidnes wilfully incurred the risk that Plaintiff might enforce the terms of the non-competition agreement.

Also, the damage done to Defendant Eidnes is mitigated by the fact that the agreement is limited in its time and geographic scope. Eidnes can work for a direct competitor in the legal staffing field as long as she does it outside of the one year prohibition and/or outside of the nine county geographic area that the agreement will cover. Defendant Eidnes argues that the conditions are overly burdensome on her, in part because of her personal circumstances. This Court is not unsympathetic to her, but I cannot ignore the law in light of those circumstances, nor can I ignore the damage that Plaintiff would suffer if this Court chose not to enforce a reasonable agreement that the parties voluntarily entered into. As such, Plaintiff has met the third prong of the analysis.

### IV. Public Interest

The public interest [**25] here is clear. This Court is obligated by its duties to the public to enforce valid employment contracts and to adjudicate disputes.

Even though the enforcement of a preliminary injunction is extraordinary, there are times when such relief is necessary. Having reviewed the arguments and filings of both parties, I GRANT Plaintiff's Motion for Preliminary Injunction. Defendant Cynthia Eidnes is enjoined according to the terms of the Preliminary Injunction order previously issued by this Court. Further, pursuant to *Fed. R. Civ. P. 65(c)*, Plaintiff must post a total bond of $ 50,000 as a reflection of the damages that may be incurred by a wrongfully enjoined party.

**IT IS SO ORDERED.**

Date: *January 10, 2008*

s/ *John Felkens*

United States District Judge



LEXSEE 591 F SUPP 2D 924

**KELLY SERVICES, INC., Plaintiff, vs. WILLIAM MARZULLO, Defendant.**

No. 08-CV-14406-DT

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

*591 F. Supp. 2d 924; 2008 U.S. Dist. LEXIS 107793; 28 I.E.R. Cas. (BNA) 1158*

November 20, 2008, Argued
November 20, 2008, Decided
November 20, 2008, Filed

**COUNSEL:** [**1] For Kelly Services, Incorporated, Plaintiff: Bernard J. Fuhs, Butzel Long, Detroit, MI; James J. Boutrous, II, Butzel Long (Detroit), Detroit, MI.

For William Marzullo, Defendant: Thomas W.H. Barlow, Jackson Lewis LLP, Southfield, MI.

**JUDGES:** PRESENT: Honorable Gerald E. Rosen, United States District Judge.

**OPINION BY:** Gerald E. Rosen

**OPINION**

OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

[*927] At a session of said Court, held in the U.S. Courthouse, Detroit, Michigan on November 20, 2008

PRESENT: Honorable Gerald E. Rosen United States District Judge

I. INTRODUCTION

This breach of contract/misappropriation of trade secrets action is before the Court on Plaintiff Kelly Services, Inc.'s motion for temporary restraining order and preliminary injunction. At issue is Defendant William Marzullo's alleged breach of a Non-Competition

Agreement and a Confidentiality and Non-Solicitation Agreement (collectively referred to herein as the "Employment Agreements") he entered into with Kelly Services during the course of his employment with the company. Defendant has responded to Plaintiff's Motion. Having reviewed and considered the parties' briefs and supporting documents, and [**2] post-hearing supplemental briefs, [1] and [*928] having heard the oral arguments of counsel, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

1 Defendant filed a "Post Submission Brief" on November 13, 2008. In response, on November 14, 2008, Plaintiff filed a "Motion to Strike Defendant's Post Submission Brief or, in the alternative, for Leave to File a Surreply." Plaintiff attached to this Motion a proposed Surreply Brief. *See* Motion to Strike, Ex. A. As Plaintiff correctly notes in its Motion to Strike, neither the Federal Rules nor the Local Court Rules provide for the filing of anything more than a brief in support of a motion, a response brief, and a reply brief. However, because this case presents nuanced areas of non-forum law, the Court appreciates the post-hearing briefs submitted by the parties. Therefore, notwithstanding Defendant's failure to seek leave to file his "Post Submission Brief," the Court will DENY Plaintiff's Motion to Strike and, instead, GRANT Plaintiff's alternative Motion for Leave to File a Surreply. Accordingly, the Court

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

591 F. Supp. 2d 924, *928; 2008 U.S. Dist. LEXIS 107793, **2;
28 I.E.R. Cas. (BNA) 1158

Page 2

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

accepts as properly filed both Defendant's "Post Submission Brief" and the Surreply Brief, [**3] filed as an attachment to Defendant's Motion to Strike.

## II. FACTUAL BACKGROUND

Plaintiff Kelly Services, Inc. is a staffing services company headquartered in Troy, Michigan that specializes in providing a wide range of employment staffing and consulting services on a national basis, including, but not limited to, outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, vender on-site and full-time placement, and consulting services. Defendant William Marzullo is a former employee of Kelly Services. Marzullo was employed with Kelly from June 1, 1998 through August 7, 2008. At the time of his resignation, Marzullo held the position of Regional Manager/Vice President for Kelly out of its Dallas, Texas office, a position to which he was promoted in 2006. (Prior to that position, Marzullo was an Area Manager, [2] as well as a Branch Manager.)

> 2   Marzullo worked within the State of Michigan from March 2001 through July 2004 when he held the position of Area Manager.

In his position as Regional Manager/Vice President, Marzullo was responsible for servicing Kelly's customers, maintaining, cultivating and creating customer and prospective customer relationships, developing [**4] business, supporting corporate initiatives and meeting corporate goals, regional strategic business planning, sales, operations, employee growth and development and recruiting and marketing candidates, both full-time Kelly employees and contract employees. The market area in which Marzullo worked and had responsibilities since 2004 covered the entire State of Texas. Further, in his position, Marzullo was exposed to Kelly's confidential and proprietary business information throughout the company's Central Region, which included the major markets in Texas -- Dallas and Houston.

At the time of his original hire, in 1998, Marzullo signed Kelly's "Agreement with Full-Time Employees of Kelly Corporations." [Supplemental Affidavit of Kristin Supanich, Kelly Service's Vice President and Division Manager for Strategic Markets Central, Ex. 1.] This Original Agreement provided, in relevant part, as follows:

In order to provide the highest quality service to its customers and maintain its leadership position in the temporary help industry, Kelly Services spends substantial time, effort and money in recruiting and training its employees, and developing programs and services to met its customers' [**5] needs. All Kelly employees have an obligation to help protect this investment.

* * *

In consideration of my employment with Kelly Services, Inc., Kelly Assisted Living Services, Inc., or any other Kelly corporation ("Kelly"), I agree as follows:

(1) Unless required by my job at Kelly, I will never disclose, use, copy or retain any confidential business information or trade secrets belonging to Kelly, Kelly's customers or Kelly's suppliers. This includes [*929] customer and employee lists, sales, service, recruiting and training techniques and manuals, sales and marketing strategies; computer programs; financial data and other similar information.

(2) [**6] While I am working for Kelly, I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner, [more than 2%] stockholder [of any publicly traded company], [more than 2%] investor [in the stock of any publicly traded company], agent or consultant. These same limitations apply for one year after I leave Kelly in any market area in which I worked or had responsibility during the last five years of my employment with Kelly.

[Supanich Supp. Aff., Ex. 1.]

In or about July 2004, Marzullo was promoted to the position of Regional Manager out of Kelly's Dallas, Texas office. Then, as indicated, in June 2006, Marzullo's

591 F. Supp. 2d 924, *929; 2008 U.S. Dist. LEXIS 107793, **6;
28 I.E.R. Cas. (BNA) 1158

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

title and responsibilities were further elevated to Regional Manager/Vice President.

Given Marzullo's high-ranking position, his increasing development and exposure to Kelly's clients, and access to Kelly's confidential and trade secret business information, in conjunction with a merit pay increase of $ 4,000, in June 2007, Marzullo signed a Non-Competition Agreement and a Confidentiality and Non-Solicitation Agreement. [*See* Supanich Supp. Aff., P [**7] 9.] These June 2007 Agreements clarified and, in some ways, narrowed, the scope of the non-compete and non-solicitation/ confidentiality obligations contained in Marzullo's original employment agreement. Pursuant to the June 2007 Non-Competition Agreement, Marzullo agreed that he would not compete, for a period of 12 months following his resignation, in any state in which he had any responsibility, or conducted any business, on behalf of Kelly in the three years prior to his termination of employment. [3] In relevant part, the Non-Competition Agreement provided as follows:

2. Confidential Information. I agree and acknowledge that during my employment, I will be exposed to confidential and proprietary information and trade secrets of the Company. The confidential and proprietary information and trade secrets include, but are not limited to, the Company' customer lists, operational procedures, marketing and sales strategies and practices, pricing information, margin information, markup information, prospect lists, customer and prospect needs and preferences information, prospective employees, employee lists, employee capabilities matrices, employee training information and practices, and [**8] the methods of operation of the Company as they exist from time to time (the "Confidential Information").

3. Restrictive Covenants.. In order to preserve the confidentiality of the Confidential Information, to prevent the theft or misuse of the Confidential Information, to protect the Company's customer relationships, with both its potential and existing customers, its customer goodwill, and to protect the

Company from improper or unfair competition, I agree that during my employment and for a period of 12 months from the date my employment terminates, for any reason, whether such termination is voluntary [*930] or involuntary, I will not directly or indirectly:

a.  Non-Competition. Participate in the ownership or control of, act as an employee, agent, or contractor of, or provide any services to, or for, any business that is engaged in the employee staffing and consulting services business, which includes, but is not limited to, direct placement, outplacement, outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, management services, vendor on-site, vendor management, and consulting services, or engage in any activity that is competitive with the Company, in [**9] any State within the United States, in which I had any responsibility, or conducted any business, on behalf of the Company in the three years prior to my termination of employment with the Company. Notwithstanding anything to the contrary contained in this Agreement, the Company agrees that I may own up to two (2%) of the outstanding shares of the capital stock of a company whose securities are

591 F. Supp. 2d 924, *930; 2008 U.S. Dist. LEXIS 107793, **9;
28 I.E.R. Cas. (BNA) 1158

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

registered under *Section 12* of the Securities Exchange Act of 1934.

[Plaintiff's Ex. A.]

3  As indicated, the Original Agreement provided that Marzullo would not solicit any Kelly customers or compete with Kelly for a period of one year "in any market area in which [he] worked or had responsibility during the last five years of [his] employment with Kelly."

Pursuant to the Confidentiality and Non-Solicitation Agreement, Marzullo agreed that (1) he would not improperly use or disclose Kelly's confidential information or trade secrets, and (2) he would not solicit any Kelly customers, potential customers, or employees for a period of 12 months following his resignation. The Non-Solicitation Agreement provides, in relevant part:

3. Restrictive Covenants. In order to preserve the confidentiality of the [**10] Confidential Information, to prevent the theft or misuse of the Confidential Information, to protect the Company's customer relationships, with both its potential and existing customers, its customer goodwill, and to protect the Company from improper or unfair competition, **I agree that during my employment and for a period of 12 months from the date my employment terminates, for any reason, whether such termination is voluntary or involuntary, I will not directly or indirectly:**

a. Non-Solicitation of Company      Employees. Solicit, divert, or attempt to solicit or divert from the Company any employee or any person providing services to, or on behalf of, the Company or influence any such person to no longer serve as an

employee or provide services to, or for, the Company; and

b. Non-Solicitation of Company Customers or Potential Customers. Solicit, divert, or attempt to solicit or divert from the Company, any work or business related to the employee staffing and consulting services business, which includes, but is not limited to, direct placement, outplacement, outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, management services, vendor on-site, vendor [**11] management, and consulting services whatsoever from any client or customer, or potential client or customer, of the Company for either myself or any other entity that may employ, engage or associate with me in any fashion.

For the purposes of this Agreement, "client(s)" or "customer(s)" of the Company, shall mean any individual, corporation, limited liability company, partnership, proprietorship, firm, association, or any other entity that I have actually sold or delivered any services to, or to which I have been exposed through Company meetings or marketing efforts, during the 12 months preceding my termination [*931] from the Company's

591 F. Supp. 2d 924, *931; 2008 U.S. Dist. LEXIS 107793, **11;
28 I.E.R. Cas. (BNA) 1158

Page 5

employ, and "potential client(s) or customer(s)" shall be any individual, corporation, limited liability company, partnership, proprietorship, form, association or any other entity that I have contacted, orally, in writing or in person, to solicit, sell and/or deliver services to, or to which I have been exposed through Company meetings or marketing efforts, during the 12 months preceding the date of my termination from the Company's employ. I will inform the Company of prospective business opportunities.

[Plaintiff's Ex. B.]

Both of these Employment Agreements [**12] contain Michigan choice of law provisions and in executing the Agreements, Marzullo consented to jurisdiction in Michigan. *See* Plaintiff's Ex. A, PP 10, 11; Ex. B, PP 12, 13. [4]

> 4   Marzullo's original employment agreement also contained a Michigan choice of law provision.

Marzullo resigned his position with Kelly Services effective August 7, 2008. At his exit interview with Tyler Eash, Kelly's Senior Director of Human Resources for U.S. Commercial Resources, Marzullo was reminded of his obligations under the Agreements. Marzullo indicated that he was going to go to work for a division of Roth Staffing Companies, LP, — a competitor of Kelly Services — where he would be responsible for its West Coast operations. According to Eash, Marzullo stated that, although the West Coast operations normally included Dallas, Texas, he would not have responsibility for Dallas, given his non-compete obligations under the Kelly Agreements. [5] Further, according to Eash, Marzullo stated that he would have to move from his

home in Dallas, to either Orange County, California or Colorado for his new position at Roth.

> 5   Defendant denies having represented to Eash that he would not be working in Dallas for Roth [**13] because of his non-compete agreement.

Contrary to Marzullo's representations, however, Kelly recently discovered that Marzullo is not only working for Roth, but is also still living and working in Dallas, Texas and, at a minimum, is responsible for Roth's Dallas, Texas territory. Marzullo's profile posted on the website www.linkedin.com, describes his position with Roth as a Regional Vice President with responsibilities for "cross-divisional, regional leadership/management of Ultimate Staffing Services and Ledgent (commercial, technical, and professional service lines of temporary and temp to hire staffing, and direct placement)."

Because Marzullo is performing the same services and serving the same market area that he worked in while at Kelly, and because Kelly believes that Marzullo has wrongfully used, or will inevitably use, Kelly's confidential information and trade secrets that he learned while employed with Kelly, Kelly filed the instant Complaint and Motion for Temporary Restraining Order or Preliminary Injunction.

Marzullo, however, denies having solicited business in Dallas and further states that he has not contacted any Kelly client, nor has he attempted to do so. Marzullo [**14] Affidavit, Defendant's Ex. A, P 11. He also states that he has not contacted any of Kelly's employees for purposes of recruiting them to Roth, nor has he used Kelly's confidential information or trade secrets. *Id.* [6] Marzullo further asserts that the territory [*932] he is currently responsible for in the Dallas area is only four counties, which is only a fraction of the State of Texas territory he was responsible for at Kelly, and that, unlike his Kelly territory, his current Roth territory also includes the entire state of Colorado and other Western states.

> 6   At the November 6, 2008 hearing on this matter, Plaintiff's counsel conceded that Kelly has no evidence showing that Marzullo has improperly used or disclosed any of Kelly's confidential information, nor does it have any evidence that Marzullo has solicited any present or former Kelly clients or customers. With respect to these aspects of Marzullo's employment

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

591 F. Supp. 2d 924, *932; 2008 U.S. Dist. LEXIS 107793, **14;
28 I.E.R. Cas. (BNA) 1158

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

agreements, Kelly states that it is proceeding not under a breach of contract theory but rather under the "threatened" misappropriation of trade secrets prong of the Michigan Uniform Trade Secrets Act, *M.C.L. §445.1901 et seq.* ("MUTSA").

III. DISCUSSION

A. THE CONTRACTUAL CHOICE OF [**15] LAW PROVISION IS VALID

As an initial matter, Defendant argues that, notwithstanding the choice of law provision in the Agreements calling for application of Michigan law, Texas law should be applied in deciding this matter. To resolve this issue, a federal court whose jurisdiction is based on diversity of citizenship must apply the conflict of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 490, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Johnson v. Ventra Group, Inc., 191 F.3d 732, 738 (6th Cir. 1999).* Thus, the Court must look to Michigan's conflict of law rules to determine whether Michigan law or Texas law governs this dispute.

Michigan has adopted the approach set forth in the Restatement (Second) of Conflict of Laws. *See Chrysler Corp. v. Skyline Indus. Servs., 488 Mich. 113, 126-27, 528 N.W.2d 698, 703-04 (1995); see also Johnson v. Ventra Group, Inc., supra, 191 F.3d at 739; Banek Inc. v. Yogurt Ventures, U.S.A., Inc., 6 F.3d 357, 361 (6th Cir.1993).* According to this approach, a contractual choice of law provision will be binding unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no [**16] other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of [§ ] 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Restatement (Second) of Conflict of Laws § 187(2) (1988).*

In the instant action, the Employment Agreements each state that "[t]his agreement shall be governed by the laws of the State of Michigan." Therefore, to determine whether this provision should be given effect, the Court must determine whether either of the exceptions set forth in *Section 187(2)* apply. *Chrysler Corp. v. Skyline Indus. Servs., supra.*

In *Lowry Computer Prods., Inc. v. Head, 984 F. Supp. 1111 (E.D. Mich. 1997),* the defendant, a California resident who worked in California, argued that the court should apply California law in determining whether to enforce the non-compete provisions of his employment agreement and grant the plaintiff's motion for preliminary injunction, despite a clause in the agreement which provided that the [**17] agreement would be "governed by and enforceable in accordance with Michigan law." The court rejected the defendant's argument, and specifically found that neither of the exceptions to enforceability of contractual choice of law provisions applied.

The court determined that inasmuch as Lowry was a Michigan corporation, Michigan had a substantial relationship to the parties and the transaction. *Id. at 1114.* Additionally, the court found that "there [*933] [was] more than a reasonable basis for choosing Michigan law, namely, to ensure that Lowry will have some certainty in defending its rights in suits with its employees all over the country." *Id.* Therefore, the exception to enforceability of the contractual choice of law provision provided in *§ 187(2)(a) of the Restatement* did not apply. *Id.*

The *Lowry* court also found that the exception set forth in *§ 187(2)(b)* did not apply. While the court acknowledged that California had a "strong interest" in monitoring the effects of non-compete agreements on in-state competition, it found that Michigan had an equally strong interest in protecting Michigan businesses from breaches of employment contracts and consequent losses of goodwill. *Id.* This interest, [**18] coupled with the "strong interest" the Michigan business had in the uniform interpretation of employment contracts tipped the scales in favor of Michigan law. *Id.* Further, the court found that California, at the time, did not have a fundamental policy barring all non-compete clauses. *Id.* Therefore, the court held the Michigan choice of law provision in the defendant's employment agreement was valid and enforceable. *Id.*

591 F. Supp. 2d 924, *933; 2008 U.S. Dist. LEXIS 107793, **18;
28 I.E.R. Cas. (BNA) 1158

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Similarly, in *Superior Consulting Co., Inc v. Walling*, 851 F. Supp. 839 (E.D. Mich. 1994), the plaintiff, a Michigan company, sued one of its former employees for breach of a non-compete agreement. The former employee lived and worked for plaintiff in Texas. Despite the existence of a Michigan choice of law provision, the defendant argued that Texas law should apply because Texas would be the state where the non-compete was to be enforced. *Id. at 846.* The court rejected that argument, applied Michigan law, and ultimately enforced the non-compete agreement. *Id. at 846-48.*

Defendant Marzullo argues in this case, that application of Michigan law would run contrary to a fundamental policy of the State of Texas and, thus, trigger the exception set forth in *§ 187(2)(b) of the Restatement.* Marzullo [**19] contends that a policy disfavoring the enforcement of covenants not to compete like the Agreement at issue in this case is embodied in Texas Supreme Court decisions construing the Texas Covenants Not to Compete Act, *Tex. Bus. & Com. Code § 15.50(a).*

*Section 15.50(a) of the Texas Business and Commerce Code* provides that

> [A] covenant not to compete is enforceable if it is ancillary to or otherwise part of an enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area and scope of activity to be restrained that are reasonable and do not impose a greater restraint than necessary to protect the goodwill or other business interest of the promisee.

*Tex. Bus. & Com. Code § 15.50(a).*

Texas courts have held that

> [F]or a covenant to be "ancillary to or part of" an enforceable agreement under *section 15.50,* "(1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and (2) the

covenant must be designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement."

*Alex Sheshunoff Management Services, L.P. v. Johnson and Strunk & Assoc., L.P.,* 209 S.W.3d 644, 649 (Tex. 2006) [**20] (quoting *Light v. Centel Cellular Co.,* 883 S.W.2d 642, 647 (Tex. 1994).

Marzullo argues that, under *Sheshunoff* and *Light,* because Kelly did not promise to provide anything in exchange for his agreement not to compete, other than continued at-will employment, the covenant not to compete here would fail under Texas law for lack of consideration and, therefore, [*934] enforcement of the covenant under Michigan law, would run contrary to a fundamental policy of the State of Texas.

However, issues of contract law, such as the existence of consideration, do not necessarily implicate a strong public policy. *See Restatement (Second) of Conflict of Laws, § 187(2)(b), cmt. g* (1971).

*Comment g to Section 187 of the Restatement* provides, in pertinent part:

> To be "fundamental" a policy must in any event be a substantial one. Except perhaps in the case of contracts relating to wills, a policy of this sort will rarely be found in a requirement such as the statute of frauds, that relates to formalities (see Illustration 6). Nor is such policy likely to be represented by a rule tending to become obsolete, such as a rule concerned with the capacity of married women (see Illustration 7), *or by general rules of* [**21] *contract law, such as those concerned with the need for consideration* (see Illustration 8). On the other hand, a fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power.

*Id.* (emphasis added).

*Illustration 8,* referenced in *Comment g to Section*

591 F. Supp. 2d 924, *934; 2008 U.S. Dist. LEXIS 107793, **21;
28 I.E.R. Cas. (BNA) 1158

*187*, involves a similar situation to the matter before the Court, and advises that the parties' contractual choice of law be enforced even though applying the choice of law provision would enforce a contract that would be invalid for lack of consideration in the state whose law would otherwise apply. [7]

  7  *Illustration 8* is as follows:

    8. A executes and delivers to B in state X an instrument in which A agrees to indemnify B against all losses arising from B's liability on a certain appeal bond on behalf of C, against whom a judgment has been rendered in state Y. The instrument recites that it shall be governed by the law of state Y. It is valid and enforceable under the local law of Y but is unenforceable for lack of consideration under the local law of X. In an action by B against A, the instrument will not be [**22] held invalid for lack of consideration.

The distinction between violation of law as opposed to violation of *policy* was explained by the court in *Shipley Co. v. Clark*, 728 F. Supp. 818 (D. Mass. 1990). That case involved a covenant not to compete which contained a Massachusetts choice of law provision and a dispute as to whether Massachusetts law or Michigan law should apply.

In *Shipley*, the defendants argued that Michigan had a strong public policy against no-compete agreements and, therefore, a Massachusetts court would not enforce the Massachusetts choice-of-law provision as to the validity of the no-compete covenants. In support of their argument they pointed to *Comshare, Inc. v. Execucom Systems Corp.*, 593 F. Supp. 981 (E.D. Mich. 1984), a case which held that, as to employment contracts between out-of-state employers and Michigan employees, a plaintiff could not enforce a no-compete clause in Michigan, even where the agreement provides for the application of another state's laws. Michigan's public policy against such covenants, according to the defendants, thus overrode an express choice-of-law provision. *Id.*

At the time of the *Comshare* decision, Michigan did, in fact, have a clear [**23] policy against no-compete agreements. Michigan had a statute which voided all non-compete agreements, whether reasonable or unreasonable. *M.C.L. § 445.761* (1979). That statute, however, was repealed in 1935, and was replaced with the current statute which provides:

    (1) An employer may obtain from an employee an agreement or covenant [*935] which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

    (2) This section shall apply to covenants and agreements which are entered into after March 29, 1985.

*M.C.L.§ 445.774a.*

Accordingly, the *Shipley* court found that as of 1985, Michigan could no longer be said to have a strong public policy against no-compete agreements.

The *Shipley* defendants argued, however, [**24] they executed the non-compete agreements before 1985 and that Michigan still has a strong policy against no-compete agreements that were entered into before 1985. As the court noted, the Michigan statute clearly provides that the new policy only applies to contracts made after March 29, 1985, and Michigan courts continue to void agreements that would have been void before the repeal of the old statute. But, as the *Shipley* court noted, this does not mean that enforcing a non-compete agreement would violate Michigan policy. The court explained:

    While defendants' argument has some

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

591 F. Supp. 2d 924, *935; 2008 U.S. Dist. LEXIS 107793, **24;
28 I.E.R. Cas. (BNA) 1158

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

force, it fails to recognize the critical distinction between Michigan's public policy and Michigan's law. If Michigan *law* were to apply, the covenants would be invalid, because the contracts are pre-1985. But here, we are applying Massachusetts' choice-of-law rules. Accordingly, the proper inquiry under Massachusetts choice-of-law rules is whether Michigan has a fundamental *public policy* that would be frustrated by the application of Massachusetts' substantive law, and not whether a Michigan court would void the covenant pursuant to a statute. Michigan has expressed its current view that it is no longer bothered [**25] by in-state restraints on competition imposed by reasonable no-compete agreements. Enforcement of the choice-of-law provision, therefore, would violate Michigan *law*, but not Michigan *policy*. It is only the latter that is relevant here. Because Michigan no longer has a public policy against no-compete agreements, therefore, defendants fail to satisfy the first of the three conditions to qualify for the exception to the rule enforcing choice-of-law provisions.

*728 F. Supp. at 825-26* (footnote omitted; emphasis in original).

The precise issue of whether Texas policy would be thwarted by application of another state's law governing covenants not to compete was addressed by the court in *Intermetro Industries Corp. v. Kent, 2007 U.S. Dist. LEXIS 28239, 2007 WL 518345 (M.D. Pa. 2007)*. As in this case, in *Intermetro* the plaintiff filed an action to enjoin a former employee, Jonathan Kent, a citizen of the State of Texas, from violating a one-year, nationwide covenant not to compete, and a motion for preliminary injunctive relief to block Kent from working in Texas with his current employer, a competitor of Intermetro. The covenant not to compete was embodied in an agreement that had a choice of law provision which provided [**26] that the agreement would be governed by Pennsylvania law. The defendant argued, however, that the Pennsylvania choice of law provision should not be given effect.

As Defendant Marzullo argues in this case, the defendant argued in *Intermetro* [*936] that application of Pennsylvania law would be contrary to Texas policy because Pennsylvania and Texas courts disagree on what constitutes sufficient consideration for a covenant not to compete. After examining the Texas statute and Texas case law -- specifically *Light* and *Sheshunoff*, the same decisions relied upon by Defendant Marzullo here -- and the Restatement (Second) of Conflict of Laws, including *§ 187(2)(b)*, *comment g* and *Illustration 8*, the court rejected Defendant Kent's argument:

That the Texas decisional law on the sufficiency of consideration for a restrictive covenant in an at-will employment context is *not* a matter of fundamental policy is illustrated by the Texas Supreme Court's holding in *Alex Sheshunoff Management Services v. Johnson, 209 S.W.3d 644 (Tex. 2006)*. In that recent decision, the Texas Supreme Court modified its ruling in *Light* by holding that a covenant not to compete is enforceable when an employee also agrees not to [**27] divulge confidential information, the employer promises to furnish the at-will employee with confidential information and specialized training, *and* the employer performs on its promise after the contract is formed, thus making the non-compete provision ancillary to an otherwise enforceable agreement. *Id. at 650-55*. In reaching this result, the court declared that it now "disagree[d] with language in *Light* stating that the Covenants Not to Compete Act requires the agreement containing the covenant to be enforceable the instant the agreement is made." *Id. at 646*. The Court further observed that the aim of the Texas legislature in enacting the Covenants Not to Compete Act was to *promote* enforcement of non-compete provisions in the at-will employment context, *id. at 652*, explaining that "in 1993, the Legislature specifically wanted to make clear that covenants not to compete in the at-will employment context were enforceable." *Id. at 654*. The court embraced the aim of the legislature by stating:

591 F. Supp. 2d 924, *936; 2008 U.S. Dist. LEXIS 107793, **27;
28 I.E.R. Cas. (BNA) 1158

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

We also take this opportunity to observe that *section 15.50(a)* does not ground the enforceability of a covenant not to compete on the overly technical disputes that our opinion in *Light* seems to [**28] have engendered over whether a covenant is ancillary to an otherwise enforceable agreement. Rather the statute's core inquiry is whether the covenant "contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." *Tex. Bus. & Com. Code § 15.50(a)*. Concerns that have driven disputes over whether a covenant is ancillary to an otherwise enforceable agreement -- such as the amount of information the employee has received, its importance, its true degree of confidentiality, and the time period over which it is received -- are better addressed in determining whether and to what extent a restraint on competition is justified. *We did not intend in Light to divert attention from the central focus of section 15.50(a). To the extent our opinion caused such a diversion, we correct it today.*

Id. at 655-56.

Thus, the Texas Supreme Court has made clear that fundamental policy of Texas supports enforcement of reasonable non-compete provisions in the at-will employment context. This recent opinion also poignantly illustrates the wisdom [**29] of not basing determinations of what constitutes "fundamental policy" on case law that attempts to delineate the parameters of adequate consideration [*937] or the degree to which a clause is ancillary to an employment contract.

Application of Pennsylvania law in this case will not contravene the fundamental policy of Texas concerning covenants not to compete in the at will employment context. As noted above, there is a strong basis for concluding that the Texas legislature *intended* a promise to employ a person on an at-will basis to constitute adequate consideration for a covenant not to compete. *See Tex. Bus. & Com. Code Ann. § 15.51(b)*; Jeffrey W. Tayon, *Covenants not to Compete in Texas: Shifting Sands from Hill to Light, 3 Tex. Intell. Prop. L.J. 143, 147, 149 (1995)*. That Texas courts might not find Mr. Kent's restrictive covenant enforceable does not suggest that a fundamental public policy would be damaged were the covenant found enforceable under Pennsylvania law. . . . The central question is whether application of Pennsylvania law would cause a substantial erosion of the quality of protection afforded under the Texas statute. Here application of Pennsylvania law would not substantially [**30] erode the Texas legislature's intent in enacting its statute, as Pennsylvania courts apply standards for assessing covenants not to compete that are similar to those set forth in the Texas statute.

*2007 U.S. Dist. LEXIS 28239, 2007 WL 518345 at **3-4* (emphasis in original; footnotes and some citations and internal punctuation omitted).

As the foregoing authorities demonstrate, Defendant

591 F. Supp. 2d 924, *937; 2008 U.S. Dist. LEXIS 107793, **30;
28 I.E.R. Cas. (BNA) 1158

Marzullo's
void-for-lack-of-consideration-under-Texas-law
argument does not establish that application of the
parties' chosen Michigan law which would allow
enforcement of the non-compete agreement would be
contrary to a fundamental Texas policy. [8]

8   Although the Court need not decide whether
the non-compete agreement would, in fact, be
deemed invalid under Texas law for lack of
consideration, Defendant's protestations
notwithstanding, it appears to the Court that
Texas courts would uphold the agreement. In
*Staples, Inc. v. Sandler, 2008 U.S. Dist. LEXIS
68589, 2008 WL 4107656 (N.D. Tex. 2008)*, the
defendant argued that Staples provided no
consideration for a non-competition agreement
beyond his continued employment and his
compensation. However, the agreement recited
that Staples "has entrusted and will entrust
Employee with proprietary information,
strategies,   [**31]   knowledge, customer
relationships and know how which would be
detrimental to the company if disclosed."
Although this appeared in the prefatory recitals in
the agreement, the court found that under
*Sheshunoff* -- which held that if an "employer
performs his promise [to disclose confidential
information] under the agreement and a unilateral
contract is formed, the covenant is enforceable if
all other requirements under the Act [i.e.
reasonable limitations as to time, geographical
area, and scope of activity restrained] are met" --
these recitals demonstrated that sufficient
consideration was provided by Staples to support
the non-compete agreement. *See also, Rimkus
Consulting Group, Inc. v. Cammarata, 255 F.R.D.
417, 2008 U.S. Dist. LEXIS 61791, 2008 WL
3833717 (S.D. Tex. 2008)* (promise to provide
employee "access to" confidential information
which was performed before employee left the
company was sufficient consideration to support a
covenant not to compete); *Beasley v. Hub City
Texas, L.P., 2003 Tex. App. LEXIS 8550, 2003
WL 22254692 (Tex. App. 2003)* (where
employment agreement stated that employee "will
be granted access" to confidential information, the
court held that employee's acknowledgment of the
same, by signing the agreement, constituted an
implied   [**32]   promise to provide confidential
information).

Both the Non-Compete and the
Confidentiality/Non-Solicitation Agreements in
this case contain similar recitals of the
performance of promises by the employer: "I
acknowledge that substantial cost and expense has
been or will be incurred by the Company for my
training, and my training and employment has
required or will require the disclosure of certain
confidential information, trade secrets and
customer relationships." Defendant does not
dispute that Kelly did, in fact, provide him with
training and confidential information. Thus, under
Texas law, Marzullo's promise not to compete, as
well as his confidentiality and non-solicitation
promises are not illusory and the agreements were
supported by sufficient consideration.

[*938] However, even if the Court were to find that
Texas has such a fundamental policy, pursuant to the
*Restatement (Second) of Conflict of Laws § 187(2)(b)*, it
is only when "application of the law of the chosen state
would be contrary to a fundamental policy of *a state
which has a materially greater interest than the chosen
state* in the determination of the particular issue" that a
choice of law provision will not be given effect. [**33]
The record here does not establish that Texas has a
"materially greater interest" than Michigan in this matter.

Defendant Marzullo is a resident of Texas who
worked for Kelly, a Michigan company, in Texas.
Admittedly, Texas, therefore, has some interest in this
litigation. However, as Plaintiff pointed out in its Reply
Brief, and as the Court noted at the November 6, 2008
hearing, Michigan's interests are substantial:

.  Marzullo entered into and had a ten (10) year
employment relationship with Kelly, a Michigan
company.

.  For more than three years, from March 2001
through July 2004, Marzullo lived and worked in
Michigan for Kelly as an Area Manager.

.  Marzullo served in a high-level position of
Regional Manager/Vice President, which included
managerial and operational duties, for the Michigan
company.

.  Marzullo reported directly to, and corresponded on

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

591 F. Supp. 2d 924, *938; 2008 U.S. Dist. LEXIS 107793, **33;
28 I.E.R. Cas. (BNA) 1158

a regular basis with, the Vice President and Division Manager of Kelly, Kristin Supanich, who was and is located at Kelly's headquarters in Troy, Michigan.

. Marzullo admittedly traveled from Texas to Michigan on numerous occasions in the course of his job duties after he moved to Texas.

. Marzullo accessed and utilized Kelly's confidential [**34] information and trade secrets, much of which are housed on computer servers located in the Troy, Michigan headquarters.

In sum, as the Court observed at the November 6, 2008 hearing, the entire employment relationship between Marzullo and Kelly was rooted in Michigan. Undeniably, the harm here would be felt in Michigan, by a Michigan-based company. By contrast, the only facts in support of the notion that Texas has any interest in this matter are that Marzullo currently lives in that State and works for a competitor there.

Furthermore, Kelly, as a national and international employer, requires certainty in defending its rights in suits with its employees all over the country. As the court found in *Lowry, supra*, this is a significantly reasonable basis for enforcing the parties' contractual choice of law.

In sum, for the foregoing reasons, the Court concludes that the Michigan choice of law provision is enforceable and Michigan law, accordingly, will be applied in deciding this dispute.

**B.    STANDARDS    FOR    PRELIMINARY INJUNCTIVE RELIEF**

In deciding whether a plaintiff is entitled to a preliminary injunction, the court is to consider four factors:

> (1) The likelihood of plaintiff's success on the [**35] merits; and

> (2) Whether the injunction will save the plaintiff from irreparable injury;

> (3) Whether the injunction will harm others; and

> (4) Whether the public interest will be served by the injunction.

[*939] *Sandison v. Michigan High School Athletic Association, Inc., 64 F.3d 1026, 1030 (6th Cir. 1995).* See also, *Superior Consulting Company, Inc., v. Walling, supra, 851 F. Supp. at 846.* These factors should be balanced and are not considered prerequisites that must be met. *In re Eagle-Picher Indus., Inc., 963 F.2d 855, 859 (6th Cir. 1992).* "These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *Id.*

**1. LIKELIHOOD OF SUCCESS ON THE MERITS**

There is no serious dispute that Defendant Marzullo violated the Non-Competition Agreement. He is working as a Regional Vice President for a competitor of his former employer and is performing the same services and serving the same market area that he worked in while employed by Kelly. Under Michigan law, covenants not to compete are enforceable as long as they are reasonable. *Rehmann, Robson & Co. v. McMahan, 187 Mich. App. 36, 46, 466 N.W.2d 325; 187 Mich. App. 36, 466 N.W.2d 325 (1991), app. denied, 438 Mich. 857 (1991).*

*M.C.L. § 445.774a (1)* [**36] provides as follows:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

*M. C. L.§ 445.774a (1).*

Further, an agreement is enforceable even if some of its terms are found to be unreasonable by the Court. See, *Rehmann, Robson & Co., supra, 187 Mich. at 46.* The Court may enforce the Agreement to the extent the

591 F. Supp. 2d 924, *939; 2008 U.S. Dist. LEXIS 107793, **36;
28 I.E.R. Cas. (BNA) 1158

Page 13

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

contract is reasonable by substituting reasonable terms for those omitted or found to be unreasonable. In this case, the Agreement entered into by Mr. Marzullo reasonably restricts his employment or line of business for a period of 12 months following termination of his employment with Kelly. Courts, applying Michigan [**37] law, have routinely upheld non-compete agreements restricting the former employee from engaging in restricted activities for periods of six months to three years. *See, e.g.,"); Bristol Window & Door, Inc. v. Hoogenstyn, 250 Mich. App. 478, 650 N.W.2d 670 (2002)* (enforcing a three-year, statewide non-competition agreement); *Lowry Computer Products, Inc. v. Head, supra, 984 F. Supp. at 1116* (enforcing a one-year prohibition); *Superior Consulting Company, Inc. v. Walling, supra, 851 F. Supp. at 847* (upholding six-month time period). *See also, Robert Half International, Inc. v Van Steenis, 784 F. Supp. 1263, 1274 (E.D. Mich. 1991).* Here, the Agreement restricts Defendant Marzullo's employment activities for a period of one year. Under the above authorities, this one-year restriction is enforceable.

The standard for reasonableness of geographic limitations in restrictive covenants is whether they are no greater than reasonably necessary to protect an employer's legitimate business interests. Here, the non-competition provisions of the Agreement only preclude Defendant Marzullo from working for a competitor within the geographic territory in which he worked while employed by Kelly in the [*940] [**38] three years prior to his termination of employment. This territory was the State of Texas. This restriction will not prohibit Marzullo from continuing in Roth's employ; rather, it only means he cannot work in one state. He can still continue to service clients in Colorado.

In view of the above-stated case law, it is unmistakable that the Non-Competition Agreement between Defendant Marzullo and Kelly Services is legally enforceable. The restrictions in this Agreement are reasonable under Michigan law as to time, geography and type of work. As a result, it is clear that Kelly is likely to succeed on the merits of its case, thus making injunctive relief appropriate.

### 2. IRREPARABLE INJURY

The second factor in determining whether to issue a preliminary injunction requires the Court to assess whether Kelly will suffer irreparable injury in the absence

of an injunction. In *Lowry, supra,* the court elaborated on the concept of irreparable injury as follows:

> The more confidential information defendant possesses and the higher the likelihood that defendant will pass that information on to [a competitor], the more the other preliminary injunction factors (particularly irreparable injury and public [**39] interest) will weigh in favor of granting a preliminary injunction. **The loss of consumer good will and the weakened ability to fairly compete that would result from disclosure of trade secrets and the breach of a non-compete agreement does establish irreparable injury.**

*984 F. Supp. at 1116.* Similarly, the Sixth Circuit has expressly held that "[t]he loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Basicomputer Corporation v. Scott, 973 F.2d 507, 511-512 (6th Cir. 1992).*

The foregoing authorities demonstrate that if Defendant Marzullo is permitted to continue working for Kelly's competitor, Roth Staffing, in the Texas market he serviced with Kelly, his former employer will be irreparably harmed.

### 3. HARM TO OTHERS

The third factor in determining whether to issue a permanent injunction requires the Court to determine whether the balance of equities weighs in favor of the entry of the preliminary injunction.

In *Superior Consulting, supra,* the Court addressed the issue of harm that would be suffered by an employee who is held to his non-competition agreement finding that the harm to the plaintiff from not enforcing [**40] a non-compete agreement would outweigh the hardship imposed by enjoining the employee for working in his field of expertise for a competitor. In reaching this decision, the Court reasoned as follows:

> Enforcing the noncompetition agreement imposed on Walling the significant hardship of not being able to work in his field of expertise, except through a

591 F. Supp. 2d 924, *940; 2008 U.S. Dist. LEXIS 107793, **40;
28 I.E.R. Cas. (BNA) 1158

business of his own, for a period of six months. Though serious, this harm is finite. If SCC suffered irreparable harm to its competitive position, the loss would be of incalculable quantity and duration. Also, the injunction sought by SCC only prevented Walling from violating his freely entered contractual obligation to SCC. While the hardship to Walling cause by issuing the preliminary injunction was not inconsiderable, the balance of hardships here titled in favor of SCC.

*Superior Consulting, 851 F. Supp. at 848.*

If an injunction is granted here, the Defendant will not be significantly harmed. As indicated, Marzullo will only be precluded from working for Roth in the Texas [*941] market for one year. He can still work in the Colorado market and any other area where he did not work for Kelly in the three years prior to his termination of employment. [**41] Finally, it bears noting that to the extent Marzullo suffers harm by not being able to compete in Texas for one year, this is certainly a risk he calculated and undertook both when he first signed the Agreement and when he decided to leave Kelly and go to work for a competitor.

### 4. PUBLIC INTEREST

Granting a preliminary injunction in the present case is also in the public interest. While recognizing the general public policy disfavoring restraints on trade and interference with a person's livelihood, this Court has previously held that "[t]he public interest[] in. . . enforcing valid employment contracts weigh[s] in favor of issuing the preliminary injunction." *Superior Consulting, supra, 851 F. Supp. at 848; See also, Lowry, supra, 984 F. Supp. at 1116* (finding the enforcement of non-competition agreements in the public interest); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Ran, 67 F. Supp. 2d. 764, 781 (E.D. Mich. 1999)* (finding that the public has an important interest in the enforcement of contracts, explaining that if the court were to refuse to enforce the terms of the contracts entered into by the parties it would be undermining the legitimate business expectations of not only [**42] the parties in the case, but of all contracting parties.)

As noted above, Defendant Marzullo has already breached the Non-Competition Agreement he had entered

into with Kelly Services, and given the competitive nature of Plaintiff's and Defendant's businesses, there is a substantial risk of further breaches. Moreover, the Michigan Legislature, by enacting *M.C.L. § 445.774a,* has expressly recognized the public's interest in enforcing non-competition agreements. Accordingly, the Court finds that the public interest supports granting an injunction.

In sum, after balancing the four factors, the Court finds that Plaintiff Kelly Services is entitled to the preliminary injunctive relief requested with respect to the Non-Competition Agreement.

### C. PLAINTIFF'S ALLEGATIONS OF "INEVITABLE DISCLOSURE" ARE INSUFFICIENT TO JUSTIFY AN INJUNCTION TO PRECLUDE DEFENDANT FROM VIOLATING VIOLATION THE CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

As for the Confidentiality and Non-Solicitation Agreement, Kelly Services admittedly has no evidence showing or suggesting that Marzullo has used or disclosed any confidential information or that he has solicited any Kelly clients or employees. However, Kelly anticipates [**43] that given Marzullo's position with one of its competitors, it is inevitable that Marzullo will use or disclose Kelly's confidential information and trade secrets. Under the Michigan Uniform Trade Secrets Act, *M.C.L. § 445.1901, et seq.,* "[a]ctual *or threatened* misappropriation [of trade secrets] may be enjoined." *M.C.L. § 445.1903(1)* (emphasis added). Misappropriation includes the disclosure or use of a trade secret without consent. *M.C.L. 445.1902(b)(ii); Sherman & Co. v. Salton Maxim Housewares, Inc., 94 F. Supp. 2d 817, 821-822 (E.D. Mich. 2000).*

In support of its "inevitable disclosure" argument, Kelly relies principally upon *PepsiCo, Inc. v. Redmond, 54 F.3d 1262 (7th Cir.1995).* [9] In *PepsiCo,* the plaintiff [*942] sought a preliminary injunction against a former employee who had signed a confidentiality agreement, to prevent him from divulging plaintiff's trade secrets or confidential information. The Seventh Circuit, applying the Illinois Trade Secrets Act, stated that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Id. at 1269.* In *PepsiCo,* the Seventh [**44] Circuit's decision to affirm the District Court's decision rested in significant part on the lower court's determination that the

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

591 F. Supp. 2d 924, *942; 2008 U.S. Dist. LEXIS 107793, **44;
28 I.E.R. Cas. (BNA) 1158

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

former employee's conduct evidenced a significant lack of candor, and proof of his willingness to misuse trade secrets. *Id. at 1270.*

> 9  Plaintiff also cites *La Calhene, Inc. v. Spolyar, 938 F. Supp. 523 (W.D. Wis. 1996)* (applying Wisconsin law) and *Uncle B's Bakery, Inc. v. O'Rourke, 920 F. Supp. 1405 (N.D. Iowa 1996)* (applying Iowa law) as also demonstrative of the "inevitable disclosure" doctrine.

The "inevitable disclosure" doctrine, however, has not been adopted by Michigan courts. In *CMI International, Inc. v. Intermet International Corp., 251 Mich. App. 125, 649 N.W.2d 808 (2002)*, noting that no Michigan case has interpreted the MUTSA statutory provision concerning "threatened" misappropriation, the Michigan Court of Appeals discussed the "inevitable disclosure" theory, specifically, noting the *PepsiCo* decision, and held

> Even assuming that the concept of 'threatened misappropriation' of trade secrets encompasses a concept of inevitable disclosure, that concept must not compromise the right of employees to change jobs. *See Hayes-Albion Corp. v. Kuberski, 421 Mich. 170, 188, 364 N.W.2d 609 (1984).* [**45] Accordingly, we hold that for a party to make a claim of threatened misappropriation, whether under a theory of inevitable disclosure or otherwise, the party must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets.

*251 Mich. App. at 133-34, 649 N.W.2d at 813.*

Because CMI offered no evidence of duplicity on the part of its former employee, Defendant Ruff, or Ruff's new employer, Defendant Intermet, beyond Intermet's employment of Ruff, the appellate court concluded that CMI did not establish a basis on which to claim inevitable disclosure. Therefore, the court determined that no preliminary injunction was warranted, and summary disposition was appropriate. *See also Computer Training & Support Corp. v. Graves, 1999 Mich. App. LEXIS 2426, 1999 WL 33435477 (Mich. App. 1999)* (affirming

trial court's denial of preliminary injunction based on a confidentiality/non-competition agreement where, although plaintiffs stated that defendant gained specialized knowledge and information through her employment with plaintiffs, they did not allege or present evidence demonstrating that defendant used that knowledge to plaintiffs' [**46] detriment and the sole basis for plaintiffs' claim rested on a conclusory, unsupported statement that defendant, on information and belief, was using plaintiffs' confidential information and trade secrets. "It is well established that an injunction will not lie upon the mere apprehension of future injury or where the threatened injury is speculative or conjectural." *Id.* (quoting *Dunlap v. City of Southfield, 54 Mich. App. 398, 403, 221 N.W.2d 237; 54 Mich. App. 398, 221 N.W.2d 237 (1974)*).

Based upon the cited Michigan authorities, the Court concludes that Plaintiff should not be granted a preliminary injunction to enjoin Plaintiff from violating the Confidentiality and Non-Solicitation Agreement. Other than the fact that Marzullo went to work for a competitor, the only evidence of "duplicity" on the part of Marzullo offered by Plaintiff is the Affidavit [*943] statement of Tyler Eash, who conducted Marzullo's exit interview on behalf of Kelly. According to Eash, Marzullo told him that he was going to work for Roth, where he would be responsible for its West Coast operations, and that although the West Coast operations normally include Dallas, Texas, he would not have responsibilities for Dallas, given his non-compete obligations. [**47] [Eash Affidavit, P 4.] Eash states that Marzullo added that he would need to move to either Orange County, California or Denver, Colorado, for his new position at Roth. *Id.*

Marzullo acknowledges that he told Eash in his exit interview that he was going to go to work for Roth. However, he states, "I was not 100% certain what my territory would be with Roth at the time of my resignation from Kelly, although I knew it might ultimately include parts of Texas and Colorado. I did know it was possible I would have to relocate, and I communicated that to Mr. Eash." [Marzullo Affidavit, P 6.]

The Court does not find that Marzullo's purported exit interview statements to be such evidence of a significant lack of candor and proof of his willingness to misuse confidential information so as to support a claim

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Page 16

591 F. Supp. 2d 924, *943; 2008 U.S. Dist. LEXIS 107793, **47;
28 I.E.R. Cas. (BNA) 1158

of "threatened" misappropriation of trade secrets under Michigan law. Marzullo's exit interview statements are a far cry from the defendant's six-months' worth of lies to his superiors and secret negotiations with the competitor which persuaded the appellate court in the *PepsiCo* case, upon which Plaintiff here so heavily relies, to conclude that the district court correctly determined that PepsiCo [**48] had a reasonable likelihood of success on its various claims for trade secret misappropriation and breach of a confidentiality agreement based upon an "inevitable disclosure" theory.

For these reasons, the Court will not enjoin Plaintiff from violating the Confidentiality and Non-Solicitation Agreement, at this time. Should Plaintiff obtain evidence in the future that Defendant is using or disclosing confidential information, or should Plaintiff learn between now and August 7, 2009 (i.e., within 12 months from the date of Marzullo's resignation from Kelly) that Marzullo is soliciting customers he sold or delivered services to during his last 12 months of employment with Kelly, Plaintiff may return to the Court and seek appropriate injunctive relief based upon the Confidentiality and Non-Solicitation Agreement.

CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction [Dkt. # 2] is GRANTED, in part, and DENIED, in part. Plaintiff's Motion is GRANTED with respect to Defendant Marzullo's Non-Competition Agreement but DENIED, without prejudice, with respect to the Confidentiality and Non-Solicitation [**49] Agreement.

Accordingly,

IT IS FURTHER ORDERED that Defendant

William Marzullo is hereby ENJOINED, for a period of 12 months from the date of this termination of employment with Plaintiff Kelly Services, Inc., from

participating in the ownership or control of, acting as an employee, agent, or contractor of, or providing any services to, or for, Roth Staffing Companies, L.P., or any of its staffing divisions, or any other business that is engaged in the employee staffing and consulting services business, which includes, but is not limited to, direct placement, outplacement, outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, management services, vendor on-site, vendor management, and consulting [*944] services, or engaging in any activity that is competitive with Kelly Services, Inc., in Texas or any State within the United States, in which Defendant Marzullo had any responsibility, or conducted any business, on behalf of Kelly Services, Inc., in the three years prior to his termination of employment with Kelly.

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike Defendant's Post Submission Brief [Dkt. # 14] is DENIED but Plaintiff's alternative Motion for [**50] Leave to File a Surreply is GRANTED. The Court accepts as filed, the proposed Surreply Brief attached as Exhibit A to this Motion.

/s/ Gerald E. Rosen

United States District Judge

Dated: November 20, 2008

This case has been designated as an eFiling case. To review a copy of the
Notice of Mandatory eFiling visit www.oakgov.com/clerkrod/efiling.

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

| STATE OF MICHIGAN 6TH JUDICIAL CIRCUIT COUNTY OF OAKLAND | NOTICE OF ASSIGNMENT TO THE BUSINESS COURT | Original – Court CASE NO. JUDGE ALEXANDER 16- 150909- CB |
|---|---|---|

Court address
1200 N Telegraph Rd   Pontiac, MI  48341

Court telephone no.
248-858-0345

| Plaintiff's name(s), address(es), and telephone number(s) Kelly Services, Inc. 999 West Big Beaver Road Troy, MI  48084 | v | Defendant's name(s), address(es), and telephone number(s) Anthony D. Kim 862 Forest Glen Court Bartlett, IL  60103 |
|---|---|---|
| Plaintiff's attorney, bar no., address, telephone no., and email address James J. Boutrous II (P53710) McDonald Hopkins PLC 39533 Woodward Avenue, Suite 318 Bloomfield Hills, MI  48304/(248) 220-1355 | | Defendant's attorney, bar no., address, telephone no., and email address |

The ☑ Plaintiff ☐ Defendant  requests assignment of the above captioned matter to the Business Court.  The case qualifies
for the Business Court and the matter should be identified as Business Court eligible pursuant to MCL 600.8031, MCL
600.8035, and LAO 2013-xx as indicated below. (Check all that apply.)

The case is a qualifying business or commercial dispute as defined at MCL 600.8031(c):  as
   ☐ All of the parties are business enterprises;
   ☑ One or more of the parties is a business enterprise and the other parties are its or their present or former owners,
      managers shareholders, members, directors, officers, agents, employees, suppliers, or competitors, and the claims
      arise out of those relationships;
   ☐ One of the parties is a nonprofit organization and the claims arise out of that party's organizational structure,
      governance, or finances;
   ☐ It involves the sale, merger, purchase, combination, dissolution, liquidation, structure, governance, or finances of a
      business enterprise.

The business or commercial dispute involves:
   ☐ Information technology, software, or website development, maintenance or hosting;
   ☐ The internal organization of business entities and the rights or obligations of shareholders, partners, members, owners,
      officers, directors, or managers;
   ☑ Contractual agreements or other business dealing, including licensing, trade secrets, intellectual property, antitrust
      issues, securities, non-compete agreements, non-solicitation agreements, and confidentiality agreements, if all available
      administrative remedies are completely exhausted, including, but not limited to alternative dispute resolution processes
      prescribed in the agreements;
   ☐ Commercial transactions, including commercial bank transactions;
   ☐ Business or commercial insurance policies; and/or
   ☐ Commercial real property.
   ☐ Other:(Please explain)

| January 6, 2016 | /s/James J. Boutrous II |
|---|---|
| Date | Name |
| | Attorney for: Plaintiff |

OCBC 01 (05/13) **NOTICE OF ASSIGNMENT TO THE BUSINESS COURT**

This case has been designated as an eFiling case. To review a copy of the
Notice of Mandatory eFiling visit www.oakgov.com/clerkrod/efiling.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

KELLY SERVICES, INC.,

        Plaintiff,

v                                    Case No. 16 - <u>150909-CB</u>CK

ANTHONY D. KIM,                      Hon. <u>JUDGE ALEXANDER</u>

        Defendant.

_____

McDONALD HOPKINS PLC
By: James J. Boutrous II (P53710)
    Maxwell J. Goss (P78594)
39533 Woodward Ave., Suite 318
Bloomfield Hills, MI 48304
(248) 220-1355
(248) 646-5075 Fax
jboutrous@mcdonaldhopkins.com
mgoss@mcdonaldhopkins.com
**Attorneys for Plaintiff**

_____

## <u>MCR 3.310(B)(1) CERTIFICATION</u>

    In compliance with Rule 3.310(B)(1) of the Michigan Court Rules and the Ex Parte
Temporary Restraining Order Guidelines, the undersigned certifies that Plaintiff Kelly Services,
Inc. ("Kelly") has not provided notice to Defendant Anthony D. Kim ("Kim") of Kelly's
application for injunctive relief since further irreparable harm to Kelly's customer goodwill and
competitive position will be caused by any such notice.

    The undersigned further certifies that notice of a hearing date and time will be made to
Defendant Kim via mail, e-mail and/or telephone as soon as such hearing date and time is
established.

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Respectfully submitted,

McDONALD HOPKINS PLC


/s/James J. Boutrous II
James J. Boutrous II (P53710)
Maxwell J. Goss (P78594)
39533 Woodward Ave., Suite 318
Bloomfield Hills, MI 48304
(248) 220-1355
(248) 646-5075 Fax
jboutrous@mcdonaldhopkins.com
dpaluzzi@mcdonaldhopkins.com
**Attorneys for Plaintiff**

Dated: January 6, 2016

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

{5878476:}

2

This case has been designated as an eFiling case. To review a copy of the                    AM
Notice of Mandatory eFiling visit www.oakgov.com/clerkrod/efiling.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

KELLY SERVICES, INC.,

      Plaintiff,

                                       Case No. 16 - 150909-CB CK

v                                                          Hon. JUDGE ALEXANDER

ANTHONY D. KIM,

      Defendant.

McDONALD HOPKINS PLC
By: James J. Boutrous II (P53710)
     Maxwell J. Goss (P78594)
39533 Woodward Ave., Suite 318
Bloomfield Hills, MI 48304
(248) 220-1355
(248) 646-5075 Fax
jboutrous@mcdonaldhopkins.com
mgoss@mcdonaldhopkins.com
**Attorneys for Plaintiff**

### PLAINTIFF KELLY SERVICES, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Kelly Services, Inc. ("Kelly"), by its attorneys, McDonald Hopkins PLC, moves this Court pursuant to MCR 3.310 to issue a Temporary Restraining Order and a Preliminary Injunction enjoining Defendant Anthony D. Kim ("Kim") from breaching his non-compete obligation set forth in his Agreement with Full Time Employees of Kelly Corporations and from breaching his duty of loyalty obligations. Kelly's Motion is based on its Verified Complaint, the exhibits attached thereto, as well as the accompanying Brief.

**WHEREFORE,** Kelly requests that this Court grant the temporary and preliminary injunctive relief set forth in the Verified Complaint.

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

<u>BRIEF IN SUPPORT OF MOTION</u>

## I.  INTRODUCTION

Plaintiff Kelly Services, Inc. ("Kelly") is a staffing services company that specializes in providing a wide range of employment staffing and consulting services, including, but not limited to, outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, vendor on-site and full-time placement, and consulting services.  Kelly employed Defendant Anthony D. Kim ("Kim") as Global Solutions Design Architect for Kelly's Outsourcing and Consulting Group ("KellyOCG").  His responsibilities involved clients locally, regionally, nationally, and internationally.  Kim executed an employment agreement, which prohibited him, for a period of one year after leaving Kelly's employment, from competing with Kelly in his former market area, from using Kelly's confidential information, and from soliciting Kelly's customers and employees.

Kim voluntarily resigned from Kelly, effective November 19, 2015.  At the time of his resignation, Kim did not identify his new employer.  Kelly has recently learned that Kim has accepted a position with Randstad Sourceright USA ("Randstad") – a direct competitor of Kelly – as Vice President, Solutions Design, performing the same services that Kim was responsible for while employed at Kelly.

Therefore, Kelly requests that this Court enter a Temporary Restraining Order and Preliminary Injunction against Kim to prohibit his unlawful conduct and to protect Kelly from suffering further irreparable harm.

## II.  STATEMENT OF FACTS

A.   <u>Kim's Employment with Kelly.</u>

    1.      **Kim's Position at Kelly.**

Kelly is a staffing services company that specializes in providing a wide range of employment staffing and consulting services, including, but not limited to outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, vendor on-site and full-time placement, and consulting services. (Verified Complaint ("Compl."), ¶ 5.)

Kim was employed with Kelly from July 6, 2004 through his voluntary resignation effective November 19, 2015. (Compl., ¶ 6.)

At the time of his resignation, Kim was on a strategic project supporting Kelly's Recruiting Process Outsourcing (RPO) business. In that position, Kim was most recently responsible, in significant part, for reconstruction of Kelly Outsourcing and Consulting Group's ("KellyOCG") RPO Reconstruction Project, which involved creating a new product for KellyOCG to leverage direct hire suppliers for RPO and Strategic Accounts Organization (SAO) solutions. Immediately prior to this project, Kim held the position of Global Solutions Design Architect for KellyOCG. More generally in his role as a Global Solutions Design Architect, Kim was an expert in OCG solutions for external and internal clients, conducting discovery sessions with clients directly to understand their full-time and temporary hiring needs, goals, and pressure points, developing strategies to achieve and overcome same, and ultimately develop the particular recruiting and workforce solution for the client at issue. Kim's client engagements were local, regional, national and international. Also, once Kim developed the particular solution for the client at issue, he worked closely with KellyOCG's implementation team to ensure that the delivery of the solution was consistent with what the client was designed by Kim. (Compl., ¶ 7.)

Kim's work with KellyOCG necessarily exposed him to highly confidential and proprietary information, which he used on a daily basis in his position. This information

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

included, but is not limited to, the structure and tools of the Global Solutions Design team, training on all solutions and services within KellyOCG, pricing of OCG and SAO solutions and services, terms of client contracts, exposure to and establishment of key client relationships, client lists, margins for solutions and services, prospect information, sales strategy, internal planning sessions, future innovations for OCG business, tools and technology platforms, such as the Recruiting Process Outsourcing (RPO) Reconstruction Project described above. (Compl., ¶ 8.)  Although based in the Greater Chicago area, Kim, as stated, was responsible for the development of client OCG solutions locally, regionally, nationally and internationally. Likewise, in Kim's RPO project role described above, he was developing market based RPO solutions locally, regionally, nationally, and internationally. (Compl., ¶ 9.)

Prior to his position as a KellyOCG Global Solutions Design Architect, Kim worked as a Center of Excellence (COE)/Account Manager Lead for KellyOCG programs. (Compl., ¶ 10.)

**2.**   **Kim's Employment Agreement with Kelly.**

When Kim was hired, he signed an Employment Agreement containing non-compete, non-solicit, and non-disclosure clauses referred to *infra* (**Exhibit A**), accepting those terms as the terms of his employment with the Michigan headquartered Kelly. (Compl., ¶ 11.)

A true and accurate copy of Kim's Agreement is attached to this Complaint as **Exhibit A** and incorporated herein by reference. (Compl., ¶ 12.) Pursuant to the Agreement, Kim agreed as follows:

> (1)    . . . I will never disclose, use, copy, or retain any confidential business information or trade secrets belonging to Kelly, Kelly's customers, or Kelly's suppliers.  This includes customer and employee lists; sales, service, recruiting and training techniques and manuals; sales and marketing strategies; computer programs; financial data and other similar information.

(2)     While I am working for Kelly, I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner, stockholder, investor, agent, or consultant. These same limitations apply for one year after I leave Kelly in any market area in which I worked or had responsibility during the past five years of my employment with Kelly. [Compl., ¶ 13; **Ex. A, ¶¶ 1, 2.**]

The Agreement also provides that Kim ". . . will pay Kelly's reasonable attorney's fees and costs involved in enforcing this Agreement." (*Id.* at ¶ 6.)  Additionally, the Agreement has a Michigan choice of law provision. (*Id.* at ¶ 7.)  (Compl., ¶¶ 14-15.)

3. **Kim's Access to Kelly's Confidential Information and Trade Secrets and His Business in Michigan.**

In his role, Kim travelled to Kelly headquarters in Troy, Michigan for training and business meetings.  For example, as recently as February and August 2015, Kim traveled to Kelly's headquarters in Troy, Michigan for training, and then again, in October 2015, Kim returned for further development of the reconstruction project for the RPO and SAO processes. (Compl., ¶ 16.)

Additionally, while in Michigan, Kim assisted in the creation and development of the KellyOCG Solution Design Framework (GSD Framework), which is highly proprietary.  More specifically, Kim was trained on the GSD Framework, as well as the associated tools attendant to the framework.  The GSD Framework, as stated, is a proprietary approach that provides the GSD team the processes, structure and associated tools that Kelly uses to create solutions for its clients. (Compl., ¶ 17.)

Similarly, Kim was trained on the KellyOCG Pricing Models while in Michigan, which provided him specific insight into Kelly's proprietary pricing models, pricing strategies, and pricing goals that are critical in maintaining existing clients and procuring new business. (Compl., ¶ 18.)

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Moreover, one of Kim's principal direct reports, Tim Dupree, Vice President, Group Leader, Global Solution Design, KellyOCG, was and is based at Kelly's headquarters in Troy, Michigan, with whom Kim conferred with frequently.  Additionally, Kim had regular contact with OCG implementers, many of whom were and are headquartered in Troy, Michigan. (Compl., ¶ 19.)

Kelly provided Kim with extensive training and knowledge of KellyOCG's business processes, strategic planning as to the corporate, divisional, and regional business plans, marketing strategies, and recruiting strategies, as more fully described above. (Compl., ¶ 20.)

The information to which Kim was exposed is of great value not only to Kelly, but also to its competitors who do not possess, or have access to, this information.  For this reason, Kelly takes reasonable steps to ensure that its information stays confidential.  Such measures include the use of non-compete, non-solicit, and confidentiality agreements, password protection, and access to information on a need-to-know basis. (Compl., ¶ 21.)

**B.     Kim's Resignation from Kelly and Employment with Randstad.**

Kim voluntarily resigned from Kelly on November 19, 2015. (Compl., ¶ 22.)  Kim, therefore, agreed to be bound by the terms and obligations set forth in his Agreement with Kelly until November 19, 2016. (*See* **Ex. A**, ¶ 2.)  However, because Kim has been violating his non-compete obligation since his resignation, the one-year duration does not begin to run until he is in compliance with the terms of the Agreement. (Compl., ¶ 23.)

Kelly has recently learned that Kim has accepted a position with Randstad Sourceright USA ("Randstad") – a direct competitor of KellyOCG.  Specifically, Kim, according to his LinkedIn Profile is working as the Vice President, Solution Design for Randstad and began immediately following his resignation from Kelly in direct contravention of his continuing

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

obligations to Kelly.  (*See* Kim LinkedIn Profile, **Exhibit B**.)  Indeed, his position with Randstad is materially the same as his prior position at Kelly.  (Compl., ¶ 24.)

Randstad offers direct hire, executive search, temporary staffing, contract consulting and temp/contract-to-hire solutions across market sectors, career specialties/disciplines and industries.  Randstad is a direct competitor of Kelly and Randstad Sourceright is a direct competitor of KellyOCG.  (*See* About Randstad, **Exhibit C**.) (Compl., ¶ 25.)

Upon information and belief, on behalf of Randstad, Kim is working in the same capacity and same market area in which he worked for Kelly.  (Compl., ¶ 26.)  The confidential information, trade secrets, and customer relationships to which Kim had access will directly aid his employment with a direct competitor, such as Randstad.  (Compl., ¶ 27.)

Indeed, during his exit interview with Maureen Goodin of Kelly Human Resources, Kim refused to disclose his new employer, and advised that he had consulted with unnamed counsel regarding what information and solutions described above were in fact proprietary to Kelly, and that his view and conclusion was that what he was advised was proprietary would be and was different than Kelly's perspective.  (*See* Goodin Affidavit, **Exhibit D**.)  The implication of this statement of course being that Kim had and has every intention of utilizing KellyOCG's confidential and proprietary information, solutions, processes, etc. in his work for Kelly's direct competitor, Randstad.  Moreover, upon information and belief, Kim downloaded some of this confidential and proprietary data to an external storage device, i.e., thumb drive or the like.  Therefore, Kelly has an immediate concern that its confidential business information may be in Kim's wrongful possession.  (Compl., ¶ 28.)

Upon information and belief, Kim has wrongfully used, and/or will inevitably use, Kelly's confidential information and trade secrets that he learned during his employment with

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Kelly. Further, he is working for a direct competitor of Kelly in knowing violation of his Agreement. Indeed, Kim's knowledge of this fact is further corroborated by his refusal to disclose the identity of his new employer – now known to be Randstad – at the time of his resignation from Kelly and when he was reminded of his continuing obligations to protect Kelly's legitimate business interests. (Compl., ¶ 29.)

C.    The Irreparable Harm Suffered by Kelly.

As a direct consequence of Kim's actions, Kelly stands to lose its employees, clients and customers, confidential, proprietary and trade secret information, the goodwill and referral business of its clients and customers, and revenues in an amount that cannot be readily ascertained. (Compl., ¶ 30.)

Kelly is also faced with the substantial risk that Kim will unlawfully use Kelly's customer, prospect, and employee information and trade secrets to Kelly's competitive disadvantage. As a result of Kim's actions, Kelly has suffered and will continue to suffer irreparable harm. (Compl., ¶ 31.)

If Kim is not immediately barred from violating his Agreement and from using Kelly's confidential and proprietary information to solicit customers and employees of Kelly, and from otherwise participating in activities that violate the non-competition provision of the Agreement, Kelly will continue to suffer irreparable harm. (Compl., ¶ 32.) Kelly lacks an adequate remedy at law to address the substantial and irreparable harm it is suffering as the result of Kim's actions. (Compl., ¶ 33.)

### III. ARGUMENT:
### THIS COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION RESTRAINING AND ENJOINING KIM'S UNLAWFUL CONDUCT

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Pursuant to MCR 3.310(B), a temporary restraining order may be granted where "immediate and irreparable injury, loss or damage will result to the applicant from the delay required to effect notice."  The Michigan Supreme Court, in *Niedzialek v Barbers Union*, 331 Mich 296; 49 NW2d 273 (1951), explained the basis for such temporary injunctive relief:

> In granting or withholding injunctive relief pendente lite in a case of this character it is highly proper and quite essential for a court to consider whether the rights of the respective litigants will best be subserved by granting temporary injunctive relief if sought.  If the personal rights or property rights involved will be best preserved by granting temporary injunctive relief in a suit presenting issues of controverted merit, such relief should be granted. [331 Mich at 300-01 (emphasis added) (citation omitted).]

The object of a preliminary injunction is to preserve the status quo, without injury to either party, until final adjudication. *Niedzialek*, 331 Mich at 301.  Issuance of an injunction involves a four factor analysis: (1) the strength of the applicant's demonstration that the applicant is likely to prevail on the merits; (2) demonstration that the applicant will suffer irreparable injury if a Preliminary Injunction is not granted; (3) whether harm to the applicant in the absence of a stay outweighs harm to the opposing party if a stay is granted; and (4) harm to the public interest if an injunction issues. *See MSEA v Dep't of Mental Health*, 421 Mich 152, 157-58; 365 NW2d 93 (1984).  Here, each of these factors weighs strongly in favor of immediate injunctive relief.

Through Kim's employment with a direct competitor, Kim will be using Kelly's confidential and proprietary information and property to compete directly with Kelly.  As discussed below, even if Km had a change of heart and intended to move forward with the utmost good faith, he cannot prevent, absent appropriate injunctive relief, his knowledge of Kelly's confidential information from showing up in his work with a competitor. *Lowry Computer Prods, Inc v Head*, 984 F Supp 1111, 1116 (ED Mich 1997) (If defendant "is working

{5866345:3}                                    9

for a direct competitor in a similar area, their knowledge <u>is bound</u> to have a significant impact on Lowry's business.") Once this information has been divulged, it cannot be retrieved. This is particularly true here because Kim was entrusted with Kelly's most sensitive information and he is now sharing it with a competitor.

In addition, Kim has purposefully availed himself of the privileges of conducting activities within Michigan. Courts have consistently held that a defendant's contacts with Michigan, even those that are not physical, during the course of employment, can evidence a defendant's intention to avail himself of the Michigan forum. *See Superior Consultant Co, Inc v Walling*, 851 F Supp 839 (ED Mich 1994). In *ACS Consultant Co v Williams*, 2007 US Dist LEXIS 15120 (ED Mich March 5, 2007), the Eastern District of Michigan exercised personal jurisdiction over California employees and reasoned that the former employees accessed and used trade secrets which were housed on the company's server located in Michigan. In *Kelly Services, Inc v Noretto*, 495 F Supp 2d 645 (ED Mich 2007), the court analyzed Kelly's Agreement, which contained terms that are identical to Kim's Agreement, and found that Michigan exercised personal jurisdiction over the former Kelly employee since she "called, faxed, or emailed on a weekly or daily basis" her contacts in Michigan and "routinely accessed information on Kelly's Michigan based computer servers in her efforts to transact business in her position with Kelly." *Id.* at 652. Here, Kim's contacts with Michigan are patently sufficient and include the following: entering into an employment relationship with Kelly, which is based and headquartered in Michigan; entering into an employment agreement which contained a Michigan choice of law provision; repeatedly traveling to Michigan for training and product development, most recently in October 2015; and having regular contact with one of his direct reports, Tim

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

{5866345:3}                                      10

Dupree, Vice President, Group Leader, Global Solution Design, Kelly OCG, who is based at Kelly's headquarters in Troy, Michigan.

Furthermore, Kelly is entitled, prospectively, to the full time period set out in Kim's Agreement from the date that the Court enters the permanent injunction. In *Thermatool v. Borzym*, 227 Mich. App 366 (Mich. App. 1998), the Michigan Court of Appeals extended the duration of a non-compete agreement beyond its stated expiration date for the period of the defendant's non-compliance. Importantly, the court explained that a party who flouts the restriction is not entitled to credit for time that the party was operating in violation of the non-compete. *Id.* at 375.

As in *Thermatool*, this Court should extend the duration set out in Kim's Agreement for the period of non-compliance. Defendant Kim conduct has acted to extend the prohibitions contained in his Agreement. Kim is working for a direct competitor, performing the same services and serving the same market area in which he worked while at Kelly – all in violation of his Agreement. (*See* Kim LinkedIn Profile, Ex. B.) Accordingly, Kelly respectfully requests that this Court issue a Temporary Restraining Order, and then issue a Preliminary Injunction, enjoining Kim from continuing his violative conduct.

A.   <u>Kelly Will Prevail on the Merits.</u>

1.   **Kim Has Breached His Enforceable Agreement with Kelly.**

Kelly is likely to succeed on the merits of its action against Kim for breach of the Agreement because: (1) Kim is currently working for Randstad, a direct competitor of Kelly, in the same market area; (2) Kim is performing the same services for a direct competitor that he provided while employed by Kelly; and (3) consequently, Kim is in a position to directly misappropriate and misuse Kelly's confidential information and trade secrets.

{5866345;3}                                    11

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

Michigan law provides that "reasonable" covenants not to compete against employees should be enforced. *Rehmann, Robson & Co v McMahan*, 187 Mich App 36, 46; 466 NW2d 325 (1991). MCL § 445.774a provides:

> Sec. 4a. (1) An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

*Id.* (emphasis added). A non-compete agreement is, thus, enforceable as long as: (1) it is reasonably drawn as to its duration, geographical scope, and line of business; and (2) it protects the legitimate business interests of the party seeking its enforcement. *Lowry,* 984 F Supp at 1116.

Indeed, three courts within the United States District Court for the Eastern District of Michigan have already concluded that Kelly's Agreement is reasonable and enforceable. In *Kelly Services, Inc v Noretto*, 495 F Supp 2d 645 (ED Mich 2007), *Kelly Services, Inc v Eidnes*, 530 F Supp 2d 940 (ED Mich 2008), and *Kelly Services, Inc  v Marzullo*, 591 F Supp 2d 924 (ED Mich 2008), copies of which are attached as **Exhibit E**, the courts analyzed Kelly's Agreement, which contained terms that are identical to Kim's Agreement, and found that the duration, geographic restriction, and the scope of activity were all reasonably tailored to protect Kelly's legitimate business interests. The courts also granted Kelly's motions for preliminary injunctions based on the irreparable harm that Kelly would suffer.

> **a.    The Agreement Protects Kelly's Legitimate Business Interests.**

The fact that Kim's Agreement protects Kelly's legitimate business interests cannot be disputed. Employers have legitimate business interests, for example, in restricting former

{5866345:3}                                                    12

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

employees from soliciting its customers, *Merrill Lynch, Inc v Gall*, 836 F Supp 428, 433-34 (WD Mich 1993); and in protecting confidential and proprietary information, such as customer lists, profit margins, corporate strategies, and pricing schemes. *Lowry*, 984 F Supp at 1116; *Superior Consultant Co, Inc v Walling*, 851 F Supp 839, 847-48 (ED Mich 1994); *Merrill Lynch, Inc v Ran*, 67 F Supp 2d 764, 775 (ED Mich 1999). Because Kim had access to, and utilized on a regular basis, Kelly's most confidential information and was granted extensive customer contact, there is no dispute that Kelly has the requisite protectable interests.

> **b.     The Restrictions in the Agreement are Reasonably Tailored to Protect Kelly.**

Kim is restricted from competing with Kelly, and from soliciting Kelly's customers and employees, for a period of one year from the voluntary resignation of his employment, in the market area in which he worked or had responsibility during the past five years of his employment with Kelly. It prohibits Kim only from competing with Kelly in the business of staffing services, including outsourcing, recruitment, recruitment process outsourcing, temporary staffing services, vendor on-site and full-time placement, and consulting services. Kim, therefore, has many opportunities to work for a plethora of other industries and is not unduly restricted from gaining a livelihood by this Agreement.

With respect to the time limitation, one year is also reasonable. Michigan courts have consistently held that covenants with one-year durations are reasonable and enforceable. Indeed, far longer periods of time have been upheld. *See, e.g., Lowry*, 984 F Supp at 1116 (finding one year reasonable and emphasizing that "as to duration, courts have upheld time periods of six months to *three years*."); *Bristol Window & Door, Inc v Hoogenstyn*, 250 Mich App 478; 650 NW2d 670 (2002) (enforcing a three-year, statewide non-competition agreement executed by an independent sales representative). Therefore, the duration of one year in Kim's Agreement is

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

more than reasonable and necessary to protect Kelly's customer goodwill, competitive edge, and confidential and trade secret information.

The geographic limitation in Kim's Agreement – "any market area in which I worked or had responsibility" – is sufficiently and reasonably tailored to protect Kelly. Relative to geographic limitations, it has been specifically held that reasonable geographic limitations may be unlimited and as broad as the entire continental United States if the plaintiff's business is sufficiently national and international in scope. *Walling*, 851 F Supp at 847 (emphasizing that Superior "does business in forty-three states"). Michigan courts also do not require specific language in the non-compete agreement as to the geographic scope. For instance, courts will allow a reasonable customer restriction to substitute for a geographic restriction. *See, e.g., Frontier Corp v Telco Comm Group, Inc,* 965 F Supp 1200 (SD Ind 1997) (applying Michigan law and holding that the non-compete covenant, which contained no geographic term, was enforceable as to customers that the defendant successfully solicited.)

Here, Kelly's business is national and international in scope, and Kim's market responsibilities were consistent with this footprint. Thus, the language of the non-competition agreement and the resulting prohibition is reasonable and enforceable.[1]

In view of the above stated case law and the decisions in *Noretto*, *Eidnes*, and *Marzullo*, it is clear that the non-compete and non-solicit obligations in the Agreement between Kim and Kelly are legally enforceable under Michigan law.

     c.     **Kim Has Blatantly Violated His Reasonable Agreement.**

---

[1] The Court may enforce the agreement to the extent the contract is unreasonable by substituting reasonable terms for those omitted or found to be unreasonable. Under Michigan law, courts are permitted to modify overbroad covenants to the extent needed to protect the employer's legitimate interests. MCL § 445.774a(1); *Rehmann,* 187 Mich App at 46.

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

There is no dispute that Kim violated his Employment Agreement with Kelly.   Kim agreed that for one year after leaving Kelly's employment, he would not compete against Kelly or associate himself with any Kelly competitor in any market area in which he worked or had responsibility during the last five years of his employment with Kelly.   He also agreed that he would not solicit Kelly's customers or employees.

Kim voluntarily resigned from Kelly, effective November 19, 2015.   At the time of his resignation, Kim did not identify his new employer.   Kelly has recently learned that Kim has accepted a position with Randstad Sourceright – a direct competitor of Kelly OCG – as the Vice President, Solution Design for Randstad, performing the same duties for which Kim was responsible while employed at Kelly.

Furthermore, Kim agreed that he would never use or disclose any confidential business information or trade secrets belonging to Kelly or Kelly's customers.   Despite these contractual obligations, Kim is in a position to directly use Kelly's confidential information and trade secrets to compete with Kelly and undermine Kelly's customer goodwill and competitive edge.   Kim's use of Kelly's confidential information also constitutes a breach of the duty of loyalty.   *See, e.g., Chem-Trend Inc v McCarthy*, 780 F Supp 458 (ED Mich 1991).   As a result of his actions, Kim has breached, and is continuing to breach, his Agreement with Kelly.

**B.     If Preliminary Injunctive Relief Is Not Granted, Kelly Will Suffer Irreparable Injury.**

Kelly will suffer irreparable harm if a preliminary injunction is not granted.   In discussing irreparable harm, the Michigan Supreme Court has noted that:

> An injury to be irreparable need not be such as to render its repair physically impossible; but it is irreparable when it cannot be adequately compensated in damages, or when there exists no certain pecuniary standard for the measurement of damages due to the nature of the right or property injured.

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

*Ainsworth v Hunting & Fishing Club*, 153 Mich 185; 116 NW 99 (1908) (citations omitted).

Similarly, Judge Cohn in *Walling* stated that "[l]oss of customer goodwill and fair competition can support a finding of irreparable harm. Such losses are difficult to calculate." 851 F Supp at 847. Furthermore, the court in *Noretto* held:

> [I]t is entirely unreasonable to expect Noretto to work for a direct competitor in a position similar to that which she held with Kelly, and forego the use of the intimate knowledge of Kelly's business operations. . . . Absent an order for preliminary injunction, it appears that Defendant's expansive knowledge of Kelly's business systems and operations will result in a loss of the customer goodwill developed by Kelly. Furthermore, Kelly will be forced to labor under the burden of unfair competition as a result of the informational asymmetry presented by its direct competitor having an employee with intimate knowledge of its operations.

495 F Supp 2d at 659. *See also Lowry,* 984 F Supp at 1116 (Defendant's "knowledge is <u>bound</u> to have significant adverse impact on Lowry's business."); *Walling,* 839 F Supp at 847-48 (finding that "use of this knowledge [client confidential information] would enable [Defendant] effectively to undercut [Superior's] rates while providing the same services provided by [Superior].")

Unless enjoined by this Court, Kim will be in a direct position to use Kelly's confidential information and trade secrets in violation of his contractual and duty of loyalty to Kelly. As described above, Kim acquired detailed confidential and proprietary information and trade secrets of Kelly. His disclosure of this information and violation of his Employment Agreement will inflict irreparable harm on Kelly. The courts have recognized that it would be totally unreasonable to expect Kim to work in a similar position for a direct competitor and ignore his intimate knowledge of Kelly's confidential business information. Therefore, because of Kim's breach of his Employment Agreement, Kelly is suffering irreparable harm to its customer goodwill and competitive position. Kelly has no adequate remedy at law for Kim's misconduct

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

because the injuries that Kelly has suffered and will continue to suffer in connection with the loss of its customer goodwill are so indefinite and speculative as to be incapable of exact proof. *See Chem-Trend*, 780 F Supp. at 462 (finding that "it would not be possible to measure plaintiff's actual loss of customers and goodwill").

C. **The Harm to Kelly If a Preliminary Injunction Is Denied Outweighs the Harm to Kim If It Is Granted.**

The injunction requested by Kelly only prohibits Kim from working for a competitor, from soliciting Kelly customers and employees, from using Kelly's confidential information and trade secrets, and from avoiding his contractual, statutory, and fiduciary obligations. It merely prevents Kim from committing wrongful acts that interfere with Kelly's contractual and property rights. Kim is free to seek employment that does not violate his obligations or involve the use or disclosure of Kelly's trade secrets and confidential information. Therefore, there can be no harm to Kim.

On the other hand, Kelly faces irreparable harm if an injunction is not granted. The loss to Kelly of customer goodwill or any confidential information is incalculable. The harm to Kelly should this Court deny a preliminary injunction far outweighs the harm to Kim should it be granted. *See Noretto*, 495 F Supp 2d at 660 ("[A]lthough Defendant may not be able to pursue her first choice with respect to an employment or location, Defendant can readily comply with the terms of the Agreement and find a suitable employment position").

D. **The Public Interest Supports the Issuance of a Preliminary Injunction.**

The public interest in protecting confidential information and enforcing valid employment contracts justifies preliminary injunctive relief. If the courts do not enjoin parties to such agreements from violating them and from misappropriating trade secrets, then the statute becomes a dead letter.

The public also has an interest in proper adjudication of disputes. The object of a preliminary injunction is "to preserve the status quo (*i.e.*, the uncontested status which precedes the pending controversy)." *Detroit v Salaried Phys, UAW*, 165 Mich App 142, 151; 418 NW2d 679 (1987). In this case, the status quo to be preserved is the status that preceded Kim's breaches of contract. A preliminary injunction would simply ensure that no further injury will result to Kelly pending a final hearing on the merits. Thus, the public interest supports not only the enforcement of reasonable agreements, but also the enjoining of violations of such agreements prior to a trial.

## IV. CONCLUSION

Based on the foregoing, Kelly requests that this Court grant the relief requested in the Verified Complaint, and enter a Temporary Restraining Order and then a Preliminary Injunction.

McDONALD HOPKINS PLC

/s/James J. Boutrous II
James J. Boutrous II (P53710)
Maxwell J. Goss (P78594)
39533 Woodward Ave., Suite 318
Bloomfield Hills, MI 48304
(248) 220-1355
(248) 646-5075 Fax
jboutrous@mcdonaldhopkins.com
mgoss@mcdonaldhopkins.com
**Attorneys for Plaintiff**

Dated: January 6, 2016

Received for Filing Oakland County Clerk 2016 JAN 06 PM 03:30

This case has been designated as an eFiling case. To review a copy of the Notice of Mandatory eFiling visit www.oakgov.com/clerkrod/efiling.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

KELLY SERVICES, INC.,

    Plaintiff,

v

ANTHONY D. KIM,

    Defendant.

Case No. 16-150909-CB-CK

Hon. JUDGE ALEXANDER

McDONALD HOPKINS PLC
By:  James J. Boutrous II (P53710)
      Maxwell J. Goss (P78594)
39533 Woodward Ave., Suite 318
Bloomfield Hills, MI 48304
(248) 220-1355
(248) 646-5075 Fax
jboutrous@mcdonaldhopkins.com
mgoss@mcdonaldhopkins.com
**Attorneys for Plaintiff**

**ORDER TO SHOW CAUSE AND**
**EX PARTE TEMPORARY RESTRAINING ORDER**

At a session of this Court held in the City of Pontiac, County of Oakland, State of Michigan on:
JAN 07 2016

PRESENT: HON. JUDGE JAMES M ALEXANDER

The Court having reviewed Plaintiff Kelly Services, Inc.'s ("Kelly") Verified Complaint, Motion for Temporary Restraining Order and Preliminary Injunction, and Brief in Support thereof, and the Court being otherwise duly advised in the premises;

**IT IS HEREBY ORDERED THAT:**

{4524600:}

(A)    On    January 27, 2016    , at    8:30AM    , Defendant Anthony D. Kim ("Kim")
shall appear before this Court to show cause why a Preliminary Injunction ordering the
relief set forth below should not be issued.

(B)    Defendant Kim is temporarily restrained and enjoined, directly or indirectly:

    1)    From working for, or acting as, an employee, partner, stockholder, investor, owner,
director, agent, or consultant for a competitor of Kelly, including, but not limited to,
Randstad Sourceright USA ("Randstad"), until further Order of this Court;

    2)    From soliciting or performing services for any Kelly customer or client for a
competing business, including, but not limited to, Randstad, until further Order of this
Court;

    3)    From soliciting or being involved in the recruitment or hire of any Kelly employee for
a competing business, including, but not limited to, Randstad, until further Order of
this Court; and

    4)    From using or disclosing any of Kelly's confidential, proprietary or trade secret
information or property.

(C)    That Kim be ordered in the form of a mandatory preliminary injunction to immediately
return all Kelly property to Kelly, including all originals and copies of tangible property,
proprietary documents, trade secrets, confidential information, discs, notes, client files,
client information, employment information, business development information, request
for proposal, request for bid, client correspondence, meeting minutes, notes of site visits,
marketing data, prospect meeting data, proposals, faxes, financial information, pricing,
contracts, marketing brochures, marketing database, marketing plans, costs, customer
lists, customer information, internal weaknesses, prospect lists, client lists, employee
lists, alliance relationships, competitive bid information, client contact lists, sales leads,
prospective employee lists, business plans, profit, margin, and forecasting information,
strategic planning, project costs, vendor information and contracts, and any other Kelly
data whether kept in hard copy or electronic form;

(D)    Kim shall preserve all evidence, whether in hard copy or electronic form, which in any
way relates to the claims made in this case.

(E)    The Court is satisfied based on the evidence presented that it clearly appears from the
Verified Complaint that immediate and irreparable injury, loss or damage will result to
Kelly, should this Temporary Restraining Order not issue.    The evidence further
demonstrates that Kelly stands to lose its employees, clients and customers, confidential,
proprietary and trade secret information, the goodwill and referral business of its clients
and customers, and revenues in an amount that cannot be readily ascertained. Kelly is
also faced with the substantial risk that Kim will unlawfully use Kelly's client and
customer information and trade secrets to Kelly's competitive disadvantage.    Such
anticipated losses constitute irreparable harm in that they are so indefinite and speculative
as to be incapable of exact proof.

Received for Filing Oakland County Clerk 2016 JAN 07 AM 10:55

Received for Filing Oakland County Clerk 2016 JAN 07 AM 10:55

(F)   The Court is satisfied, based on the evidence presented, that Kelly is not required to post a bond pursuant to MCR 3.310(D)(1) and (2).

(G)   In connection with same, Defendant Kim must file and serve responsive papers and briefs by ___4:30pm___ a.m. / p.m. on ___1/20/16___.

(H)   Plaintiff Kelly may file and serve any reply papers and briefs by ___4:30 pm___ a.m. / p.m. on ___1/25/16___.

(I)   This Order shall remain in effect until further Order of this Court.

(J)   Plaintiff must praecipe the Show Cause date.
      IT IS SO ORDERED.

                                    /s/James M. Alexander
                                    Oakland County Circuit Court Judge

                                                        AM

{4524600:}

3

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

KELLY SERVICES, INC.,

      Plaintiff,

                                        Case No. 16-150909-CB

v.

                                        Hon. James M. Alexander

ANTHONY D. KIM,

      Defendant.

_____

**McDONALD HOPKINS PLC**
**By:  James J. Boutrous II (P53710)**
        **Maxwell J. Goss (P78594)**
39533 Woodward Ave., Suite 318
Bloomfield Hills, MI 48304
(248) 220-1355
(248) 646-5075/Facsimile
jboutrous@mcdonaldhopkins.com
mgoss@mcdonaldhopkins.com
**Attorneys for Plaintiff**

_____

## NOTICE OF HEARING

      PLEASE TAKE NOTICE that **Plaintiff Kelly Services, Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction** shall come on for hearing before the Honorable James M. Alexander in his courtroom on **Wednesday, January 27, 2016 at 8:30 a.m.** or as soon thereafter as it may be heard.

                                    McDONALD HOPKINS PLC

                                  /s/James J. Boutrous II
                                  James J. Boutrous II (P53710)
                                  Maxwell J. Goss (P78594)
                                  39533 Woodward Ave., Suite 318
                                  Bloomfield Hills, MI 48304
Dated:  January 8, 2016                     **Attorneys for Plaintiff**

Received for Filing Oakland County Clerk 2016 JAN 08 PM 12:37

{5895246:}

Received for Filing Oakland County Clerk 2016 JAN 14 AM 10:37

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

KELLY SERVICES, INC.
V.                                                    CASE NO. 16-150909-CB
ANTHONY D. KIM

AFFIDAVIT OF SPECIAL PROCESS SERVER

**Michael Fahey**, being first duly sworn on oath deposes and states that he/she is over the age of 18 and not a party to the above action.

That he/she served the within:

        ( **X** ) Summons & Complaint
        (  ) Citation to Discover Assets
        (  ) Rule to Show Cause
        (  ) Subpoena
        ( **X** ) Other: **Letter; Summons; Verified Complaint for Injunctive and Other Relief (w/Exhibits A-D); Notice of Assignment to the Business Court; Plaintiff Kelly Services, Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction (w/Exhibits A-E); MCR 3.310(B)(1) Certification; Notice of Hearing; Order to Show Cause and Ex Parte Temporary Restraining Order**

1.    ( **X** ) By leaving a copy with the named party, **Anthony D. Kim** personally on **January 10, 2016**.

2.    ( **X** ) That the sex, race, and approximate age of the person with whom he/she left the documents were as follows:

SEX: **Male**        RACE: **Asian**        APPROXIMATE AGE: **35**

3.    ( **X** ) That the place where and the time of day when the documents were served were as follows:
PLACE: **862 Forest Glen Court, Bartlett, IL 60103**
TIME OF DAY: **2:45 PM**

Signed and Sworn before me
This __12__ day of **January 2016**

OFFICIAL SEAL
JOHN KIENZLE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMM. EXPIRES 12/05/17

Michael Fahey
Special Process Server
IT'S YOUR SERVE, INC.
Private Detective Agency No. 117-000885

16-00444